**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRAN KOSKY ROTH IRA on Behalf of Nominal Defendant, VEREIT, INC, formerly known as AMERICAN REALTY CAPITAL PROPERTIES, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>GLENN J. RUFRANO, BRUCE FRANK, HUGH R. FRATER  MARK S. ORDAN,  JULIE G. RICHARDSON NICHOLAS S. SCHORSCH, DAVID KAY, BRIAN BLOCK, LISA BEESON and GRANT THORNTON, LLP,<br><br>    Defendants,<br><br>    --and--<br><br>VEREIT, INC. formerly known as AMERICAN REALTY CAPITAL PROPERTIES, INC.,<br><br>    Nominal Defendant. | Civil Action No. |

**<u>SHAREHOLDER DERIVATIVE COMPLAINT</u>**

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................1

JURISDICTION AND VENUE ...........................................................................7

THE PARTIES .....................................................................................................8

    A.    Plaintiff ...................................................................................................8

    B.    Defendants .............................................................................................8

        1.    Auditor Defendant ....................................................................8

        2.    Director Defendants..................................................................9

        3.    Former Officer Defendants.....................................................10

        4.    Nominal Defendant..................................................................12

        5.    Related Litigation ...................................................................13

DUTIES OF THE DIRECTOR DEFENDANTS .................................................14

DUTIES OF THE FORMER OFFICER DEFENDANTS ...................................15

SUBSTANTIVE ALLEGATIONS .....................................................................15

    A.    Company Background ...........................................................................15

    B.    Schorsch's Tangled Web of Companies...............................................16

    C.    ARCP's Explosive Growth and Red Flags of Increasing Audit Risk ..................19

    D.    ARCP's Aggressive AFFO Growth Targets .......................................22

THE MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS ..................23

    A.    McAlister Discovers the Accounting Errors .......................................28

    B.    McAlister Tells Grant Thornton Which Ignores Her Concerns ............30

    C.    The October 29 2014 Partial Restatement ...........................................30

    D.    The Company Announces an Extensive Restatement ...........................32

        1.    The Restatement Was Material..................................................33

2.   ARCP Failed to Properly Account for and Disclose Related Party Transactions and Paid Schorsch-Related Entities for Nothing ................ 35

3.   ARCP Failed to Properly Record Acquisition Merger and Other Non-Routine Transaction Related Expenses during 2013 and 2014 ................ 36

4.   ARCP Failed to Properly Record Timely Impairment Charges of its Long Lived Assets ................................................................... 37

5.   ARCP Failed to Properly Account for Goodwill in Connection with the CapLease Merger ........................................................... 38

6.   ARCP's Other GAAP Failures ............................................ 39

E.   The Company's Public Filings Did Not Comply with SEC Regulations ............ 40

1.   Because of GAAP, ARCP' Financials During the Relevant Period Violated SEC Regulations and Constituted Securities Fraud ................ 40

2.   ARCP's Financial Also Materially Misstated A Non-GAAP Metric—the AFFO .............................................................. 40

3.   ARCP's Material Weakness in Internal Controls Violated SEC Regulations ....................................................................... 42

GRANT THORNTON COMMITTED NEGLIGENCE, GROSS NEGLIGENCE AND BREACHED ITS CONTRACT WITH ARCP ............................................. 43

A.   Grant Thornton Failed to Render an Accurate Audit Report with Respect to ARCP's 2013 Annual Financial Statements ................................ 44

B.   Grant Thornton Failed to Conduct the ARCP 2013 Audit in Accordance with PCAOB Standards ......................................................... 45

1.   Grant Thornton Failed to Exercise the Requisite Level of Care in Auditing ARCP's Long-Lived Assets ...................................... 46

2.   Grant Thornton Failed to Exercise the Requisite Level of Care in Auditing ARCP's Related Party Transactions Pertinent to ARCP's 2013 Financials ............................................................... 46

C.   Grant Thornton Ignored the Risks of a Material Misstatement of ARCP's 2013 Financials ................................................................... 48

D.   Grant Thornton Failed to Obtain an Understanding of ARCP's Internal Controls ............................................................................. 52

E.   Grant Thornton Failed to Exercise Reasonable Care in Reviewing ARCP's Financial Information in its Interim Reports ................................... 53

ii

ARCP INCURRED SIGNIFICANT DAMAGES CAUSED BY GRANT THORNTON'S NEGLIGENCE AND THE FORMER OFFICE DEFENDANTS' BREACHES OF THEIR FIDUCIARY DUTIES ...................................................................59

    A.    Moody's and S&P Downgrade ARCP's Ratings ................................63

    B.    ARCPS' Value and Business Prospects are Severely and Detrimentally Impacted ......................................................................63

DERIVATIVE AND DEMAND ALLEGATIONS ....................................................66

COUNT I  BREACH OF FIDUCIARY DUTY  (Against the Director Defendants) ...................68

COUNT II  BREACH OF FIDUCIARY DUTY  (Against the Former Officer Defendants).......................................................................................................69

COUNT III  NEGLIGENCE  (Against Grant Thornton) ..............................................71

COUNT IV  BREACH OF CONTRACT  (Against Grant Thornton) .........................................74

PRAYER FOR RELIEF .........................................................................................75

Plaintiff, FRAN KOSKY ROTH IRA ("Plaintiff"), through her undersigned attorneys, alleges the following on information and belief, based upon the extensive investigation of her counsel, including the making of a demand upon the Board of Directors ("Board" or "Board of Directors") of VERIET, Inc., formerly known as American Realty Capital Properties, Inc. ("ARCP" or the "Company") by letter dated July 21, 2015 (the "Demand"), attached hereto as Exhibit A, and the absence of any response thereto, the rulings of this Court, including an Opinion and Order entered on June 24, 2015 (the "June Order") entered in *Serafin v. Schorsch*, 14 civ. 9672 (S.D.N.Y.), and the Summary Order Denying in Part and Granting in Part Motions to Dismiss Amended Complaint with Leave to Amend entered on November 6, 2015 (the "November 2015 Order")  in *In re American Realty Capital Properties, Inc. Litig.*, Case No. 15-00040 (AKH), pending in the United States District Court for the Southern District of New York (the "Securities Action"), except as to those matters which are personal to Plaintiff:

## NATURE OF THE ACTION

1.      This is a demand refused or demand ignored shareholder derivative action ("Action") on behalf of nominal defendant Vereit, Inc., formally known as American Realty Capital Properties, Inc. ("ARCP" or the "Company"), against, Glenn J. Rufrano ("Rufrano"), Bruce Frank ("Frank"), Hugh R. Frater ("Frater") Mark S. Ordan ("Ordan"),   and Julie G. Richardson ("Richardson") (the "Director Defendants"), who were members of ARCP's Board of Directors  when Plaintiff made the Demand, appended hereto as Exhibit A, on the Chairman of the Board to take action against the wrongdoers, and presently constitute a majority of the Board.  The wrongdoers are former directors and high level executives,  Nicholas S. Schorsch ("Schorsch") and David Kaye ("Kaye"), who each served time as Chief Executive Officer and directors of ARCP during the relevant time period, and Brian Block ("Block") and Lisa Beeson ("Beeson"), who were also senior officers charged with preparing or approving one or more of

ARCP's financial statements and in some cases certifying the statements and signing SEC filings containing those statements during the relevant time period. Schorsch, Kaye, Block and Beeson are sometimes referred to as Officer Defendants. It is also an action against Grant Thornton, LLP ("Grant Thornton"), ARCP's auditor during the wrongdoing alleged herein.

2.      This Action arises from the Officer Defendants' violations: of the federal securities laws, including their admissions that certain of these defendants intentionally manipulated the financials of ARCP during the period of at least May 2013 and possibly before that time (the "Relevant Period") their failure to properly oversee the Company's financial statements and their waste of corporate assets, constituting a breach of their duty of good faith, loyalty and care under Maryland law, in connection with certain of ARCP's financial statements filed with the SEC and their management of ARCP. As a result in part of their actions, ARCP and these Officer Defendants have been sued in consolidated securities class actions captioned, *In re American Realty Capital Properties, Inc. Litig.*, Case No. 15-00040 (AKH), pending in the United States District Court for the Southern District of New York (the "Securities Action"), and Company is presently subject to government investigations.

3.      This Action also arises from the Director Defendants' failure to bring action against the Officer Defendants for their breaches of fiduciary duty, as set forth above, and to even respond to the Demand, constituting bad faith conduct under Maryland law and a complete abdication of their fiduciary duties.

4.      This Action also alleges claims on behalf of ARCP against its auditor Grant Thornton for breach of its contract with ARCP and professional negligence in relation to its audit of the Company's financial statements, and its review of the Company's interim financial statements and certain financial releases during the Relevant Period.

2

5.     ARCP is a multi-billion dollar publicly traded real estate investment trust ("REIT") incorporated under the laws of Maryland that was headquartered in New York City at the time of the wrongdoing alleged and is now headquartered in Phoenix, Arizona.

6.     ARCP is part of a "tangled web" of REITs and alternative reinvestment entities created by billionaire investor Schorsch through which he raised money, created additional REITs, created entities that provided advisory services to these REITS, engaged in related party transactions, and bought them out within a short period of time, all of which earned Schorsch and those associated with him hundreds of millions of dollars in fees.

7.     Since at least 2007, Grant Thornton was the primary auditor for many, if not all, of Schorsch's related entities and was an integral part of the Schorsch tangled web.

8.     During the Relevant Period, ARCP's internal controls and accounting systems were under severe pressure caused by several factors, including Schorsch's drive to make ARCP, his flagship entity, into the next Vanguard Group ("Vanguard") and to corner the market on single tenant commercial properties.  Consequently, during the Relevant Period, the Company was engaged in repeated capital raises in order to fuel Schorsch's acquisition spree, which placed the Company under pressure to meet aggressive financial benchmarks such as its adjusted funds from operations ("AFFO"), a key metric used by investors and analysts to gauge REITs, which would more easily enable the Company to raise capital.

9.     In fact, On July 5, 2011, ARCP filed with the SEC its final amended registration statement on Form S-11 in anticipation of its initial public offering to be conducted in September of that year. The registration statement tells investors that AFFO is the fundamental metric in assessing the Company's performance and that ARCP's various expenses and management fees would be pegged to reported AFFO. For example, the registration statement states the

management fees paid by ARCP would be set by a formula relying in part on AFFO, giving Schorsch and Kay, at least, motive to manipulate the Company's financials. Moreover, the amount of permissible distributions made under the Company's senior secured revolving acquisitions credit facility were limited based on AFFO. AFFO would govern when dividends could be paid on shares of stock owned by the manager of ARCP. In short, the Company, using AFFO as the benchmark for assessing performance, encouraged shareholders to do the same, and made numerous other elements of its business contingent on AFFO, and by extension the accurate reporting of AFFO.

10.    By 2013, the Company was in a rapid fire acquisition mode, announcing three major acquisitions: ARCT IV for $3.1 billion in July 2013; Caplease for $2.2 billion in May 2013; and Cole Real Estate Investments, Inc. ("Cole") for $11.2 billion announced in October 2013. The Company described the foregoing transactions as marking "a Transformative 2013 for ARCP."

11.    At the same time, the Company, which was part of the tangled web of inter-related Schorsch controlled entities, had intertwined internal controls and consistently engaged in intercompany transactions, making it a particularly high audit risk.

12.    In February 2014, Lisa McAlister ("McAlister"), ARCP's then recently promoted Chief Accounting Officer ("CAO"), raised concerns that the Company's AFFO, in connection with its year end 2013 financial  had been altered and that its method for calculating AFFO had suddenly been changed (resulting in a higher AFFO).

13.    Although McAlister reported this concern to Grant Thornton, among others, she was directed by Grant Thornton to file what she believed to be a questionable 2014 First Quarter

Form 10-Q ("1Q 2014 Form 10-Q") also with a potentially inflated AFFO with the United States Securities and Exchange Commission ("SEC").

14.     It was not until the fall of 2014, after the Company had filed two materially false quarterly statements for 2014containing inflated AFFO, that the Company, through its Audit Committee of the Board ("Audit Committee"), first began taking steps to investigate these issues.  The Audit Committee's investigation resulted in what would become a multi-year, detailed restatement of the Company's financial statements covering the period from 2011 through the second quarter of 2014, which revealed that the Company's public filings were riddled with violations of generally accepted auditing procedures ("GAAP") as well as non-GAAP measures that no competent auditor performing its duties could have missed.

15.     As a result of the Audit Committee's investigation, the Company filed a Form 8-K on October 29, 2014 (the "October 29th Form 8-K"), in which the Company publicly admitted that the accounting errors had been "intentionally made" and "intentionally not corrected" in the Company's Annual Report on Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K") – the very filing McAlister brought to Grant Thornton's attention - and its 1Q14 Form 10-Q and June 30, 2014 (the "2Q 2014 Form 10-Q"), as well as earnings releases and other financial communications for these periods (the "October 2014 Restatement").

16.     The October 29th Form 8-K further stated that the Audit Committee "ha[d] expanded its investigation to encompass the Company's audited financial statements" for the year ended December 31, 2013 and that further adjustments to the Company's financials, including its audited 2013 financials, might be necessary, and that the Company was forced to "re-evaluat[e] its financial reporting controls and procedures."

17.     These admissions were only the tip of the iceberg.  On March 2, 2015, the Company announced a sweeping restatement (the "March 2015 Restatement," together with the "October 2014 Restatement, the "Restatement").

18.     In its March 2, 2015 Form 10-K/A ("March 2, 2015 10-K/A"), the Company announced that it was restating its previously issued financial statements for the years ended December 31, 2013 and 2012 and its Forms 10-Q/A for the periods ended March 31, 2014 and 2013, June 30, 2014 and 2013, and September 30, 2013.  The March 2015 Restatement disclosed that recently placed management had determined that the "Company's internal control over financial reporting and its disclosure controls and procedures . . . were not effective at December 31, 2013 due to certain material weaknesses."  Further, the Company acknowledged that the "material weaknesses had not been remediated, and additional weaknesses in [its] internal control over financial reporting existed, at March 31, 2014, June 30, 2014 and September 30, 2014."  The Company also admitted that its "disclosure controls and procedures were not effective."

19.     The March 2015 Restatement also revealed that AFFO reported in the Company's SEC filings and other financial communications was overstated for fiscal year 2011, fiscal year 2012, fiscal year 2013 (including each fiscal quarter of 2013), and the first two fiscal quarters of 2014.

20.     The need for the Restatement was caused by the misconduct of the Officer Defendants and the negligence and breach of contract and professional malpractice of ARCP's long time auditor, Grant Thornton, which the Audit Committee was supposed to oversee and monitor.

21.     Upon announcement of the October 2014 Restatement, ARCP's stock price plummeted almost 36% eliminating around that time over $3 billion in market capitalization.

22.     ARCP's credit ratings were also adversely impacted, law enforcement authorities reportedly opened a criminal probe of ARCP, and the Company is now under investigation by the Federal Bureau of Investigation ("FBI") and the SEC.  The Company has also been sued in the Securities Action, in which most of the claims were recently upheld as properly pled and in which the Court also gave plaintiffs' counsel in that case the right to replead.

23.     The Restatement and the ensuing damage it caused the Company would not have occurred but for the conduct of the Officer Defendants and Grant Thornton's negligence, professional malpractice and the breach of its contractual duties to ACRP.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. §1331(a)(1) because complete diversity exists between plaintiff and each defendant and the matter in controversy exceeds $75,000.   This is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

25.     The Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of New York, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper under 28 U.S.C.§1391(a) because during the wrongdoing herein because both nominal defendant ARCP and Grant Thornton have offices in New York County, one or more of the individual defendant resides in or maintains executive offices in this District, a substantial portion of the transaction complained of herein occurred in this District, and

7

defendants have received substantial compensation in this District by doing business here and engaged in numerous activities that had an effect in this District.

## THE PARTIES

### A.    Plaintiff

27.    Plaintiff is an ARCP shareholder who has continuously held ARCP shares throughout the period of the wrongdoing and intends to hold such shares through the pendency of this Action.   Plaintiff will fairly and adequately represent the interests of ARCP and its shareholders in this Action.  Plaintiff is a citizen of California.

### B.    Defendants

### 1.    Auditor Defendant

28.    Defendant Grant Thornton is a limited liability partnership based in Chicago, Illinois.  It maintains an office at 757 Third Avenue, 9th Floor, New York, NY 10017.

29.    Grant Thornton has had a long-standing relationship with ARCP since at least 2007 and has audited at least 27 Schorsch-related entities over that period.  At the beginning of 2014, Grant Thornton was the auditor for approximately 17 Schorsch-related entities, generating fees of approximately $3.9 million in 2013 alone as the following chart indicates, and has audited up to 27 Schorsch-related entities. During 2013, Grant Thornton was retained in the following:

| Entity | Audit Fees | Year Ended December 31, 2013 Audit Related fees | Other | Total | Notes |
|---|---|---|---|---|---|
| American Energy Capital Partners - Energy Recovery Program, LP | $ 10,500 | $ - | $ | $ 10,500 | (1) |
| American Realty Capital Daily Net Asset Value Trust, Inc. | 95,224 | - | - | 95,224 | (1) |
| American Realty Capital Global Trust, Inc. | 80,789 | - | - | 80,789 | (2) |
| American Realty Capital Hospitality Trust, Inc. | 204,870 | - | - | 204,870 | (3) |
| American Realty Capital Properties, Inc. | 1,486,557 | - | 106,087 | 1,592,644 | (1) |
| American Realty Capital Trust V, Inc. | 221,017 | 41,400 | - | 262,417 | (1) |
| American Realty Healthcare Trust II Inc., | 129,599 | - | - | 129,599 | (1) |
| American Realty Healthcare Trust III Inc., | - | - | - | - | (1)(5) |

8

| Entity | Audit Fees | Audit Related fees | Other | Total | Notes |
|---|---|---|---|---|---|
| American Realty Healthcare Trust Inc., | 232,115 | - | - | 232,115 | (4) |
| American Realty New York City REIT Inc. | - | - | - | - | (1)(6) |
| American Realty Retail Centers of America II Inc., | 198,543 | - | - | 198,543 | (1) |
| American Realty Retail Centers of America Inc., | 151,669 | 23,935 | - | 175,604 | (1) |
| BDCA Venture, Inc. | 204,000 | 22,500 | 8,190 | 234,690 | (1) |
| Business Development Corp of America | 275,040 | - | - | 275,040 | (1) |
| Business Development Corp of America II | - | - | - | - | (1)(5) |
| New York REIT, Inc. | 208,460 | 33,640 | - | 242,100 | (1) |
| Realty Finance Trust Inc. | 124,659 | - | - | 124,659 | (1) |
| | $ 3,623,042 | $ 121,475 | $ 114,277 | $ 3,858,794 | |

Notes

(1) Resigned on Jan. 22, 2015.

(2) Dismissed on Jan. 13, 2015.

(3) Dismissed Grant Thornton on February 3, 2014 and engaged KPMG, LLP.

(4) Entity merged with Ventas on Jan. 15, 2015.

(5) Did not perform services during 2013.

(6) Company was established in Dec. 2013.

30.     Given the extent to which Grant Thornton was involved in Schorsch's tangled web of entities, including its audit of multiple entities in that web, and the amount of fees it earned therefrom since at least 2007, Grant Thornton cannot be considered independent, much less act as an independent advisor on any investigation pursuant to a shareholder demand for action.

**2.     Director Defendants**

31.     Defendant Rufrano became the Company's Chief Executive Officer and a director in April 2015.   Upon information and belief, Rufrano is a citizen of New York.

32.     Defendant Frater has served as the Company's Non-Executive Chairman and as an independent director since April 2015. Frater serves on the Board's Audit Committee and the Nominating and Corporate Governance Committee. Upon information and belief, Frank is a citizen of New York.

9

33.     Defendant Frank has served as a director of the Company and member of the Board's Audit Committee since July 2014 and became the Chairman of the Audit Committee in December 2014. served on both the Board's Compensation Committee and the Nominating and Corporate Governance Committee since November 2014.  Upon information and belief, Frank is a citizen of New York.

34.     Defendant Ordan has served as an independent director of the Company since June 2015 and serves on the Board's Nominating and Corporate Governance Committee and Audit Committee.  Upon information and belief, Ordan is a citizen of Maryland.

35.     Defendant Richardson has served as an independent director of the Company since April 2015 and serves on the Board's Compensation Committee and the Nominating and Corporate Governance Committee.  Upon information and belief, Richardson is a citizen of New York.

36.     Rufrano, Frater, Frank, Ordan and Richardson are collectively referred to as the "Director Defendants."

### 3.     Former Officer Defendants

37.     Defendant Schorsch founded ARCP and served as its CEO and Chairman of the Board at relevant times. He ceased serving as CEO on October 1, 2014 but remained as Chairman until December 15, 2014. At relevant times, defendant Schorsch served as an officer and/or director at a multitude of entities affiliated with ARCP. In 2014, Schorsch's salary as CEO of ARCP was $1.1 million and he was awarded an equity retention award valued at $24.8 million by the Compensation Committee. Under a 2013 "Multiyear Outperformance Plan" approved by the Compensation Committee, Schorsch could have been given 42.5% of a bonus pool valued at hundreds of millions over the next five years. Defendant Schorsch is also a

10

defendant in the related securities class action.   Upon information and belief, Schorsch is a citizen of New York.

38.     Defendant Kay served as the President of ARCP beginning in December 2013 and he became a director of the Company in February 2014. Kay replaced Schorsch as CEO on October 1, 2014. On December 15, 2014, Kay resigned from all of his positions at ARCP.  Kay's 2014 salary was $600,000 and he was awarded by the following 2014 compensation by the Compensation Committee: (a) a cash retention award of $4.6 million; (b) an equity retention award of $3.2 million; and (c) a $15,000 signing bonus.  In 2013, defendant Kay was given a cash bonus of $4.6 million and a stock award of $3.2 million. Defendant Kay is also a defendant in the related securities class action.  Upon information and belief, Kay is a citizen of New York.

39.     Defendant Block served as Chief Financial Officer ("CFO") of ARCP Executive Vice President from ARCP's formation in December 2010 and became its Treasurer and Secretary in December 2013. On October 28, 2014, defendant Block resigned. However, Block remained Executive Vice President and CFO of AR Capital, ARCP's former manager, and other non-traded direct investments sponsored and/or controlled Schorsch. Defendant Block signed the admittedly materially false and misleading 2014 Forms 10-Q and the 2013 Form 10-K. Block has been employed in the REIT businesses of defendant Schorsch since approximately 2007. According to ARCP's public filings, defendant Block previously served as CFO and executive vice president of all non-traded investment programs sponsored by AR Capital until January 2014. Defendant Block served as a director of Schorsch-related RCAP since February 2013 and served as its CFO and treasurer from February 2013 until December 2013. Defendant Block was previously responsible for the accounting, finance and reporting functions at the ARCP Capital

group of companies. Defendant Block is also a defendant in the related securities class action. Upon information and belief, Block is a citizen of New York.

40.     Defendant Beeson served as the Company's President and COO from November 2013 to December 15, 2014 when she "stepped down." In 2013, defendant Beeson was given a $750,000 cash bonus and a stock award of approximately $730,000. Beeson signed the subsequently-restated Form 10-K for the 2013 fiscal year filed in February 2014 containing misleading and inaccurate financial statements. Defendant Beeson is also a defendant in the related securities class action.  Upon information and belief, Beeson is a citizen of New York.

### 4.     Nominal Defendant

41.     Nominal Defendant ARCP is a publicly traded REIT organized under Maryland law.  ARCP was known as American Realty Capital Properties, Inc. until July 28, 2015 at which time it was renamed Vereit, Inc., and has moved it principal place of business to Arizona.

42.     According to its public statements, ARCP acquires, owns and operates single-tenant and multi-tenant commercial real estate properties and this property portfolio is leased to high quality corporate tenants which typically occupy properties located in "well-trafficked, strategic locations."  ARCP purports to focus on acquiring mid-term and long-term leases which provide for monthly income generation and "outsized" growth potential over the longer term. ARCP now trades on NASDAQ Global Select Market under the symbol "VER."

43.     As demonstrated below, ARCP is the flagship entity which is part of the "tangled web" of Schorsch-related entities.   These entities engaged in a variety of inter-company transactions and had intertwined internal controls.  At the time of ARCP's dissemination of its false and misleading financial statements and the waste of its assets, ARCP raised billions of dollars which it used to fund no less than five multi-billion acquisitions of other REITs and real

estate portfolios in order to effectuate Schorsch's ambition of cornering the market on single tenant commercial properties and becoming the next Vanguard.

44.     Meeting aggressive benchmarks was crucial in effectuating the Company's acquisition spree.  For example, in ARCP's $11 billion acquisition of Cole, the Company issued to Cole stockholders 1.0929 shares of ARCP common stock valued at $13.35 for each Cole share, representing 98% of all outstanding Cole shares.  ARCP funded the $3 billion purchase of ARCTIV with stock valued at $12.87.  ARCP also funded the acquisition of its $774 million GE Capital NNN portfolio with stock valued at $15.50, and funded its $1.59 billion acquisition of Red Lobster assets with newly issued shares priced at $12

45.     This acquisition spree and Schorsch's desire to turn ARCP, his flagship entity, into another Vanguard, increased the risk of accounting errors in the Company's financial statements, which were already subject to substantial risk given the number of related party transactions in which ARCP and Schorsch-related entities engaged.

### 5.     Related Litigation

46.     Beginning on October 30, 2014, the first of ten class actions was filed against ARCP and others (including in some cases Grant Thornton) alleging violations of the Securities Exchange Act of 1934.  On February 13, 2015, those securities class actions were consolidated in the United States District Court for the Southern District of New York as the Securities Action.

47.     On November 6, 2015, in the November Order, the Court upheld as properly plead most of the claims asserted in the Securities Action, including claims pursuant to Section 10(b) of the Securities Exchange Act of 1934, against Schorsch and Kay, among others.  It also found a potential fraud claim against Grant Thornton, and gave the Securities Action plaintiffs leave to replead those and other claims.

48.     During the hearing, the Court remarked that, "[w]here there is a derivative complaint on waste and mismanagement, those would be very interesting allegations as the way money was sucked out of ARCP." This case is based in part on those claims of waste.

49.     In the November Order, the Court also upheld as properly pled Section 11 claims against all of the individually named defendants, including former members of the Audit Committee who undertook an investigation of the accounting issues constituting one of the bases for this action.

50.     On December 8, 2014, the shareholder derivative action entitled *Serafin v. Schorsch*, 14 civ. 9672 (S.D.N.Y.) (the "Serafin Action") was filed based upon the theory that demand upon the board at the time would have been futile.

51.     In the June Order, the Court dismissed the action but found that Schorsch and Kay were not independent such that they could not "reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule," because they were alleged to have "participated in fraudulent conduct." Opinion at 6.

## DUTIES OF THE DIRECTOR DEFENDANTS

52.     By reason of their positions as directors of ARCP and their ability to control the business and corporate affairs of ARCP, the Director Defendants owed ARCP fiduciary obligations of good faith and loyalty under Md. Code Ann., Corps. & Ass'ns § 2-405.1, including not willfully neglecting their duties. Under §2-405.1, the Director Defendants were required to act with the care that an ordinarily prudent person in a like position would use under similar circumstances and not to abdicate their responsibilities in properly responding to the Demand.

53.     The Director Defendants further have a duty to act in the best interests of the Company, which, in this case, includes bringing suit against the Former Officer Defendants and

Grant Thornton for its professional negligence, malpractice and breach of contract on behalf of the Company, and not to willfully neglect their duties. This is particularly true in light of the Court's June and November Orders, finding fraud claims against Schorsch and Kay as properly pled, the fact that none of the Defendants in the Securities Action sued pursuant to Section 10(b) challenged those pleadings (thus admitting that intentionally fraudulent conduct and scienter were properly pled), and upholding Section 11 claims against former members of the Audit Committee, who conducted the original investigation into the accounting issue raised here and in the Securities Action.

## DUTIES OF THE FORMER OFFICER DEFENDANTS

54. The Former Officer Defendants had the same obligations as the Director Defendants, of a fiduciary duty of care and loyalty in their actions as officers of the Company. They particularly had a duty to use reasonable care prior to signing a financial statement issued by the Company and to not rely blindly on the input of the Company's auditor.

55. Moreover, their conduct in potentially, intentionally violating the federal securities laws, and wasting ARCP's assets by "sucking" out monies, cannot be exculpated under Md. Courts and Judicial Proceedings §5-418(a).

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

56. ARCP is a publicly traded REIT that acquires, owns and operates single-tenant, free-standing commercial real estate properties primarily subject to net leases with high credit quality tenants. The Company invests in properties that are net leased to: (a) credit tenants, which are generally large public companies with investment-grade ratings and other creditworthy tenants; and (b) governmental, quasi-governmental and not-for-profit entities.

57.     ARCP was founded in 2011 and went public on September 7, 2011, raising approximately $70 million through the sale of over 5.5 million shares at $12.50 per share.  As of June 20, 2012, its portfolio consisted of 118 properties.

58.     At least one article in *REITWrecks* questioned whether the ARCP initial public offering was nothing more than an effort by Schorsch and his related executives to get out from under "fat" personal guarantees, on a triple net lease portfolio that was leveraged at 104% loan to value, with negative operating cash flow, and $102 million in debt maturing in 45 days, based upon over-inflated appraisals, suggesting that ARCP's financials were dubious from the start.[1]

59.     Despite its suspect accounting, among other things, ARCP has become the flagship entity in the Schorsch tangled web of entities, helping Schorsch raise billions of dollars from investors.[2]

**B.     Schorsch's Tangled Web of Companies**

60.     ARCP is one of over 20 entities of real estate and alternative investment companies constituting a "tangled web" of Schorsch-related entities, many of them interrelated with overlapping management teams and audited by Grant Thornton, which Schorsch created to provide research and management services to each other and to help raise additional funds, which he then used to buy out his non traded REITS.

61.     As described in a December 19, 2014 Forbes.com article:

> Schorsch became a billionaire by constructing a complex web of interrelated companies–at one point he was CEO of more than a dozen companies. He raised money for his nontraded REITs, took them public, and then used those vehicles to buy out his own other nontraded REITs. His fully integrated operation not only

---

[1] www.reitwreck.com/forum/viewtopic.php?f=24&t=279 (July 18, 2011).

[2] *The Wall Street Journal*, "Investors Rethink American Realty-Linked REITs", www.wsj.com/articles/investors-rething-american-reatlyreits-1414789368.

manufactured nontraded, high-yielding REITs, it also provided research and advisory services to them, and controlled the second largest independent financial advisory operation in the nation (9,200 brokers) who peddled them.

62.     A November 5, 2014 article in *The Wall Street Journal* entitled "For Schorsch, an Empire Under Siege" describes Schorsch's companies as "a tangle of like-sounding names such as American Realty Capital Global Trust II and American Realty Capital Healthcare Trust III" that have "raised $20.8 billion over the past seven years from small investors, the most of any real estate company . . . . The companies use the money to buy properties ranging from nursing homes to FedEx Corp. distribution centers. The goal is to flip properties quickly at a profit to repay investors and build a strong track record in hopes of collecting still more money from them."

63.     An accompanying illustration in the November 5, 2014 edition of *The Wall Street Journal* article depicts Schorsch's business model as follows:



17

64.     A November 5, 2014 article in *The Wall Street Journal* also points out that the tangle of Schorsch-related entities routinely sold properties to each other, "each time racking up fees for Mr. Schorsch and his management team."

65.     Grant Thornton was an active participant in Schorsch's tangled web of companies and thus not independent.  Grant Thornton has had a long-standing relationship with Schorsch, performing services for ARCP since at least 2007.  Further, Grant Thornton performed audit and other accounting services for many of the Schorsch-related entities which provided lucrative fees to the Grant Thornton and its partners.

66.     Grant Thornton has been the auditor for at least 27 Schorsch-related entities including the below:

> Company Name:
>
> American Energy Capital Partners - Energy Recovery Program, LP
>
> American Realty Capital - Retail Centers of America II, Inc.
>
> American Realty Capital - Retail Centers of America, Inc.
>
> American Realty Capital Centers, Inc.
>
> American Realty Capital Daily Net Asset Value Trust, Inc.
>
> American Realty Capital Global Trust II, Inc.
>
> American Realty Capital Global Trust, Inc.
>
> American Realty Capital Healthcare Trust II, Inc.
>
> American Realty Capital Healthcare Trust III, Inc.
>
> American Realty Capital Healthcare Trust Inc.
>
> American Realty Capital Hospitality Trust, Inc.
>
> American Realty Capital New York City REIT II, Inc.
>
> American Realty Capital New York City REIT, Inc.
>
> American Realty Capital Properties, Inc.

American Realty Capital Trust III, Inc.

American Realty Capital Trust IV, Inc.

American Realty Capital Trust V, Inc.

American Realty Capital Trust, Inc.

ARC - NorthCliffe Income Properties, Inc.

ARC Properties Operating Partnership, L.P.

BDCA Venture, Inc.

Business Development Corp of America

Business Development Corp of America II

New York REIT, Inc.

RCS Capital Corp

Realty Finance Trust, Inc.

Realty Income Corp.

**C.      ARCP's Explosive Growth and Red Flags of Increasing Audit Risk**

67.      In order to fulfill Schorsch's desire to create a new Vanguard, ARCP had been engaged in a rapid fire acquisition program, experiencing explosive growth with total assets increasing from $132 million on December 31, 2011 to over $21 billion at June 30, 2014. During 2013 alone, ARCP announced three major acquisitions: ARCT IV for $3.1 billion in July 2013; Caplease for $2.2 billion in May 2013; and Cole for $11.2 billion announced in October 2013. The Company described the foregoing transactions as marking "a Transformative 2013 for ARCP."

68.      Indeed, by 2014 ARCP owned more than 4,400 properties accounting for almost 100 million square feet.  ARCP's explosive growth, particularly during 2013, put tremendous pressure on the Company's accounting personnel, accounting systems and internal controls,

19

which already presented a high risk audit situation given that it was part of a tangled web of inter-related companies.

69.     The Company's increased audit risk as a consequence of this, from a financial reporting standpoint, was questioned by investors and analysts as early as November 2013, putting the Former Officer Defendants and Grant Thornton on notice of these risks.

70.     In a publicly available article on November 11, 2013 on *philly.com*, the author noted that "[t]he group's [ARCP's] rapid expansion has made some investors wary" and cited concerns expressed by analysts following the Company: "'We are concerned about potential integration issues with the numerous transactions' by American Capital, analysts Michael Gorman and Timothy Feron wrote in a Janney Capital Markets report to clients."

71.     In yet another red flag, Michelson, a former director of ARCP and member of the Audit Committee, received a June 2, 2014 letter from Marcato Capital Management LP ("Marcato"), a San Francisco-based investment manager (the "Marcato Letter"), stating that the Company's "rapid acquisitions of CapLease, ARCT IV, and Cole" have made the financial statements "complicated" with "many moving pieces . . . . that the Company itself seemingly cannot keep . . . straight."

72.     The Marcato Letter provided two examples of reporting errors in the Company's public filings which should have put the Audit Committee on notice that that the Company was under increasing audit risk and that its financials had "errors":

> On May 20th, in an 8-K filing in which it attempted to show its Pro Forma first quarter financial statements, the Company used an inaccurate share count; as a result, it was forced to file an amendment telling the market to disregard the previous filing, and a subsequent 8-K with new Pro Forma financials. ARCP's shares sold off on news of the inaccurate 8-K, and have yet to substantially recover.

*     *     *

In the prospectus for its recent equity issuance, the Company stated the fees associated with the Red Lobster transaction were $108 million. On May 29th, the Company put out an 8-K disclosing that the fees were actually $10.8 million, and it had initially overstated the figure by a factor of 10. While we are relieved to know that the Company did not spend $108 million in fees to close a $1.5 billion portfolio acquisition, we are alarmed by what appear to be disorderly financial controls exposed by the Company's second material disclosure error in as many weeks.

We believe the existence of these errors is symptomatic of the larger problem: The Company is engaging in too many transformative transactions too quickly.

73.     According to a November 2, 2014 *Bloomberg* article entitled "American Realty Accounting Errors Roil Real Estate Empire," there were others besides Marcato who raised similar concerns about ARCP's accounting due to its rapid acquisition strategy:

> [ARCP] has completed more than 20 acquisitions since its inception, according to data compiled by Bloomberg. The company's stock price rose to as high as $17.82 in May 2013. "***There were many people in the space who raised concerns about very rapid growth,***" said Barry Vinocur, the editor of REIT Wrap, an industry newsletter. "***When you grow that rapidly the risk is things may fall through the cracks.*** Then, there were those who downplayed those concerns saying those raising them were envious."

74.     These red flags, and the increasing audit risk presented by the Company's rapid fire capital raises and expansion, should have put the Former Officer Directors on notice that they needed to proceed with a higher level of inquiry regarding ARCP's financial statements and should have raised a red flag for Grant Thornton with respect to its reviews and audits. Although the Company was operating in an environment of greater audit risk, the scope of the Restatement indicates that no such steps were taken to address those risks.

### D.    ARCP's Aggressive AFFO Growth Targets

75.    In order to sustain this rapid fire round of capital raises and acquisitions, the Company had to meet aggressive AFFO and other benchmarks - yet another red flag to both Grant Thornton and the Former Officer Defendants of the possibility of materially false and misleading financial statements and of auditor malpractice.

76.    In February 2013, for instance, ARCP reported strong 2012 AFFO and declared that the Company was "positioned for dynamic growth."  By late 2013, ARCP emphasized to investors that ARCP would report "a growth rate of about 30% over 2013 AFFO per share."

77.    On February 27, 2014, ARCP announced its results for the quarter and year ended December 31, 2013.  In regard to AFFO and growth, the press release quoting Block, who stated that "2013 proved to be a record-setting year for ARCP both in terms of earnings and growth, allowing us to beat consensus estimates.   Based on the strength of our self-originated acquisitions, success in our Private Capital Management business and savings in G&A costs from having true economic scale, we firmly believe that 2014 will be an even more impressive year.  These factors should fortify our 2014 AFFO guidance of $1.13 to $1.19 per share."

78.    On July 2, 2013, with the announcement of the acquisition of ARCT IV, ARCP revised its AFFO guidance for 2014 to $1.19 to $1.25 per share.  The press release also stated that ARCP's "AFFO is estimated to grow dramatically by approximately 31% from previously issued guidance for 2013E of $0.91 to $0.95 . . . ."  These statements put the Company under increasing pressure to meet unrealistic AFFO and other financial benchmarks and constituted red flags to both the Former Officer Defendants and Grant Thornton that the Company's audit risk was increasing.

## THE MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

79.     On May 6, 2013, ARCP issued a release announcing its financial results for the first quarter, ended March 31, 2013 ("1Q13"). The Company reported 1Q13 AFFO of $30.8 million, or $0.20 per fully diluted share, compared to AFFO of $3.4 million during the fourth quarter of 2012.

80.     Also, on May 6, 2013, ARCP filed its Form 10-Q for the period ended March 31, 2013 with the SEC (the "1Q 2013 Form 10-Q"), which was signed by Schorsch and Block, reiterated ARCP's previously reported financial results in a press release that day, including AFFO, and represented that those financial results were accurate and presented in accordance with U.S. GAAP. In addition, the 1Q 2013 Form 10-Q (and each of ARCP's other quarterly and annual reports filed with the SEC described herein) contained certifications signed by Schorsch and Block pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX"), attesting that the financial information contained in the filing was true, that it did not omit material facts, and that the Company's internal and disclosure controls were effective.

81.     On July 23, 2013, the Company filed with the SEC a preliminary prospectus, and on July 25, 2013, a preliminary prospectus supplement, for the July 2013 Offering of $300 million in 3% notes. The offering materials specifically incorporated by reference the 2012 Form 10-K and 1Q 2013 Form 10-Q.

82.     On August 6, 2013, ARCP issued a release announcing its financial results for the second quarter, ended June 30, 2013 ("2Q13"), and reported "Record . . . Operating Results." For the quarter, the Company reported AFFO of $32.8 million, or $0.19 per fully diluted share.

83.     On August 6, 2013, ARCP filed its Form 10-Q for the period ended June 30, 2013 with the SEC (the "2Q 2013 Form 10-Q"), which was signed by Schorsch and Block. The 2Q 2013 Form 10-Q reiterated ARCP's previously announced financial results from a press release

that day and represented that those financial results were accurate and presented in accordance with GAAP. The 2Q 2013 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting.

84.     On November 7, 2013, ARCP issued a release announcing its financial results for 3Q13. For the quarter, the Company reported AFFO of $46.7 million, or $0.21 per fully diluted share, representing a quarter-to-quarter increase of over 42%, and confirmed "[u]pdated AFFO pro forma 2014 guidance of $1.13 to $1.19 per share."

85.     On November 7, 2013, ARCP filed with the SEC its Form 10-Q for the period ended September 30, 2013 (the "3Q 2013 Form 10-Q"). The 3Q 2013 Form 10-Q, which was signed by Schorsch and Block, reiterated ARCP's previously announced financial results from the press release issued that day and represented that those financial results were accurate and presented in accordance with GAAP. The 3Q 2013 Form 10-Q represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting. The 3Q 2013 Form 10-Q also included Schorsch's and Block's certifications pursuant to SOX.

86.     On February 27, 2014, the Company filed its Form 10-K for the 2013 fiscal year ended December 31, 2013 (2013 Form 10-K") with the SEC. The 2013 Form 10-K reported AFFO for 2013 of $163.9 million and net loss of approximately $406 million. The 2013 Form 10-K states the award pool under the Outperformance Plan was $222.1 million. Filed with the Form 10-K were certifications signed by Schorsch and Block pursuant to the federal securities laws attesting to the truth and accuracy of the 2013 Form 10-K. The 2013 Form 10-K also states in part:

We consider FFO and AFFO useful indicators of the performance of a REIT. Because FFO calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets (which can vary among owners of identical assets in similar conditions based on historical cost accounting and useful-life estimates), they facilitate comparisons of operating performance between periods and between other REITs in our peer group. Accounting for real estate assets in accordance with U.S. GAAP implicitly assumes that the value of real estate assets diminishes predictably over time. Since real estate values have historically risen or fallen with market conditions, many industry investors and analysts have considered the presentation of operating results tor real estate companies that use historical cost accounting to be insufficient by themselves. We exclude certain income or expense items from AFFO that we consider more reflective of investing activities, other non-cash income and expense items and the income and expense effects of other activities that are not a fundamental attribute of our business plan. These items include unrealized gains and losses, which may not ultimately be realized, such as gains or losses on derivative instruments, gains or losses on contingent valuation rights, gains and losses on investments and early extinguishment of debt. In addition, by excluding non-cash income and expense items such as amortization of above and below market leases, amortization of deferred financing costs, straight-line rent and non-cash equity compensation from AFFO we believe we provide useful information regarding income and expense items which have no cash impact and do not provide us liquidity or require our capital resources. By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our ongoing operating performance without the impacts of transactions that are not related to the ongoing profitability of our portfolio of properties. We also believe that AFFO is a recognized measure of sustainable operating performance by the REIT industry. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies that are not as involved in activities which are excluded from our calculation.

*   *   *

In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules I3a-15(e) and 15d-15(e) of the Exchange Act) as of the

> end of the period covered by this Annual Report on Form 10-K..
> Based on such evaluation, our Chief Executive Officer and Chief
> Financial Officer have concluded, as of the end of such period, that
> our disclosure controls and procedures are effective in recording,
> processing, summarizing and reporting, on a timely basis,
> information required to be disclosed by us in our reports that we
> file or submit under the Exchange Act.

87. The 2013 Form 10-K was signed by, among others Schorsch, Block, and Beeson. As subsequently revealed in 2015 and alleged in detail below, the AFFO figures reported in the 2013 Form 10-K were materially overstated and as were the certifications attesting to the adequacy of the Company's internal controls.

88. On May 8, 2014, ARCP issued a release announcing its financial results for the first quarter, ended March 31, 2014 ("1Q14"). The release emphasized that ARCP had achieved "Record First Quarter 2014 Operating Results" and that "AFFO [was] in Line With Company Expectations at $0.26 per share[.]" The Company reported AFFO available to common stockholders of $147.4 million, or $0.26 per fully diluted share, representing a year-over-year increase of 334.6%.

89. On May 8, 2014, ARCP filed with the SEC its Form 10-Q for the period ended March 31, 2014 (the "1Q 2014 Form 10-Q"), which was signed by Schorsch and Block, reiterated ARCP's previously announced financial results, in a press release that day, and represented that those financial results were accurate and presented in accordance with GAAP. The 1Q14 Form 10-Q represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting. The 1Q14 Form 10-Q also included Schorsch's and Block's certifications pursuant to SOX.

90. On July 29, 2014, the Company issued a press release announcing its financial results for the second quarter of 2014. The press release states in part:

**Selected operating highlights for the quarter include:**

26

**Increased Revenues**: Increased revenues to $382.0 million, up 595.2% compared to the same period a year earlier.

**Increased AFFO**: Increased AFFO to $205.3 million, up 429.0% compared to the same period a year earlier, and increased AFFO per share to $0.24, up 26% compared to the same period a year earlier.

**Pro Forma AFFO Run Rate**: Pro forma normalized estimated AFFO run rate as of year-end 2014 of $1.18 - $1.20 per share including 2014 completed and announced transactions. This AFFO estimate does not include any balance sheet acquisitions in excess of our $4.5 billion 2014 guidance, no dispositions, no rent growth or G&A synergies for 2015 and assumes results for Cole Capital consistent with the Company's 2014 projection.

*  *  *

"Our balance sheet acquisitions in the quarter, owned and under contract, of 1,217 properties in over 210 separate transactions demonstrates the continuing systematic execution of our core acquisition strategy and testifies to the repeatability of our investment process. As always, we see a tremendous volume of deals, but with only approximately $250 million of acquisitions remaining to transact in calendar year 2014 on the balance sheet to meet our previously announced $4.5 billion target, we intend to maintain a highly disciplined and selective approach to purchase the best assets for the portfolio. Our real estate team remains able to self-originate and close transactions in a timely manner -both at a granular level and for large-scale sale-leasebacks. This enables us to achieve superior pricing. Moreover, by routinely culling through the existing portfolio, we are identifying further opportunities that can be realized by harvesting capital derived from non-core assets and re-deploying that capital in an accretive manner. At the same lime, we are thoughtfully managing our debt portfolio by lengthening debt maturities and taking advantage of the current rate environment. The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly delivering the balance sheet and maximizing value for our stockholders

91.    On July 29, 2014, ARCP filed its Form 10-Q for the period ended June 30, 2014 with the SEC (the "2Q 2014 Form 10-Q"), which was signed by, among others, Schorsch and, Block, and which reiterated ARCP's previously announced financial results, and represented that

those financial results were accurate and presented in accordance with GAAP. The 2Q14 Form 10-Q represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting. The 2Q14 Form 10-Q also included Schorsch's and Block's certifications pursuant to SOX,

### A.    McAlister Discovers the Accounting Errors

92.    Unsurprisingly, this rapid expansion and the need to fuel it by raising capital increased the audit risk and resulted in accounting errors and changes in critical metrics.

93.    The discovery and the tip of the iceberg in what would become an extensive restatement was first discovered by McAlister, then the rapidly rising star CAO of the Company.

94.    As she alleged in a complaint filed in the action captioned, *McAlister v. American Realty Capital Properties, Inc.*, Index No. 162499/2014 (Sup. Ct. N.Y. Co. (the "McAlister Action," "McAlister Compl.," "McAlister Complaint"), McAlister first discovered issues with the Company's method for accounting for its AFFO in February 2014 in relation to the Company's filing of its First Quarter 2014 Form 10-Q. According to the McAlister Complaint, at some point in February 2014, before the audit of the 2013 financials was completed, McAlister discovered that in the fourth quarter of 2013, the Company, likely at the behest and insistence of Kay, then the CEO, the Company "had changed the basis upon which it reported its AFFO relative to previous financial quarters without apparent justification, resulting in an inflated AFFO."

95.    According to the McAlister Complaint, in about February 2014, Ryan Steel ("Steel"), then the Director of External Reporting for ARCP, confirmed to McAlister that in the 2013 Form 10-K Report, the Company had changed its methodology of reporting its AFFO relative to previous financial quarters, resulting in a material overstatement of the Company's

AFFO of $0.03 per share during the 1Q14.[3] McAlister agreed with Steel's conclusion and conferred with Block.   Apparently following the Company's "Duty to Report" Policy which called for employees to report "illegal or unethical" business conduct to a superior, they both determined that it was essential to disclose this accounting issue to Kay, which they proceeded to do.[4] The policy, however, did not call for reporting to the Board or the Audit Committee.   The only other recourse an employee had to report "illegal or unethical" conduct, according to the policy, was to "contact the Chief Executive Officer of the Company." Once McAlister and Block brought the accounting change to Kay's attention, however, "in an apparent effort to avoid public disclosures of the Company's faltering financial performance," Kay told McAlister and Block not to change or correct the materially misleading reporting.[5]

96.     The McAlister Complaint alleges that during a conference call in July 2014, Schorsch directed Block and McAlister to reallocate the funds used to calculate the AFFO and "shift the numbers in the 2Q14 report in an effort to conceal the previous improper reporting, by having Mr. Block prepare a schedule changing the add-back amortization and write off of deferred financing costs."[6]

97.     Additionally, the McAlister Complaint alleges that "the Company, at the direction of Messrs. Schorsch and Kay, changed the beginning point for its AFFO calculation," as further described above.[7]

---

[3] McAlister Compl. ¶¶30-32.

[4] McAlister Compl. ¶¶34-36.

[5] McAlister Compl. ¶¶36-37.

[6] McAlister Compl. ¶39.

[7] McAlister Compl. ¶39.

### B.     McAlister Tells Grant Thornton Which Ignores Her Concerns

98.     McAlister, feeling uncomfortable about the manipulation of funds and Schorsch's and the Company's refusal to correct the previous improper AFFO calculation contained in the 1Q 2014 Form 10-Q, sought the help of Grant Thornton and emailed Jessica Estrada ("Estrada"), a manager at Grant Thornton, calling attention to the manipulative accounting practices reflected in the 2Q14 report.[8] Despite the 1Q 2014 Form 10-Q being manipulated, Estrada and Richard LeFleur ("LeFleur"), a partner at Grant Thornton, replied to McAlister's communication, informing her that she could sign the 1Q 2014 Form 10-Q and file it "as is," thereby furthering the cover up.[9]

99.     McAlister filed the report "based on the Grant Thornton instruction."[10]

100.     In November 2014, both McAlister and Block were terminated and publicly made scapegoats for the accounting fraud, resulting in McAlister's filing of the McAlister Action in December 2014, asserting claims for defamation and for having been terminated for reporting accounting malfeasance.

101.     Since that time, McAlister, the mother of two special needs children, has voluntarily dismissed her complaint under somewhat suspicious circumstances pursuant to an agreement with Schorsch and Kay, both of whom were named in McAlister's suit.

### C.     The October 29 2014 Partial Restatement

102.     Notwithstanding repeated red flags prior to this time, by September 7, 2014, the Audit Committee indicated that it finally got notice of potential "accounting concerns" and presumably commenced an investigation.

---

[8] McAlister Compl. ¶44.

[9] McAlister Compl. ¶46.

[10] McAlister Compl. ¶¶44-45.

103.   The first "shoe to drop" based upon its early investigation was a limited restatement announced in the "October 29th Form 8-K." in which the Audit Committee admitted that the Company had committed accounting errors, which were "intentionally made" and "intentionally not corrected," in the Company's 2013 Form 10-K, and its 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, as well as in earnings releases and other financial communications for these periods.   The October 29th 8-K admitted that these financial statements "should no longer be relied upon."   The October 29th Form 8-K further stated that the Company had materially misrepresented its AFFO for the three months ended March 31, 2014 and, as a result, overstated AFFO for that period, just as McAlister had told Grant Thornton.

104.   ARCP further admitted in the October 29th Form 8-K that other AFFO and financial statement errors were "intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014." In fact, according to the October 29th 8-K, the Company recorded preliminary adjustments reducing AFFO by $28 million for the six months ended June 30, 2014.

105.   The October 29th Form 8-K further indicated that the Audit Committee "ha[d] expanded its investigation to encompass the Company's audited financial statements" for the year ended December 31, 2013, and that further adjustments to the Company's financials, including its audited 2013 financials, might be necessary.

106.   The October 29th Form 8-K further admitted that the Company was forced to "reevaluat[e] its financial reporting controls and procedures" and stated that the Company "intends to make the necessary changes to its controls and procedures to remediate any control deficiencies that are identified through the Audit Committee's investigation." On December 14,

2014, Schorsch, Kay, and Beeson, the Company's chief operation officer, resigned in anticipation of the filing of the McAlister Action.

### D.     The Company Announces an Extensive Restatement

107.    In the period between October 2014 and March 2015, the Audit Committee purportedly continued its investigation of "accounting concerns" related to the Company's financials, though the scope of that investigation is questionable.

108.    On March 2, 2015, the Company announced an extensive restatement and amended its previously issued financial statements including filing a Form 10-K/A, amending years ended December 31, 2013 and 2012, and Forms 10-Q/A amending quarters ended March 31, 2014 and 2013, June 30, 2014 and 2013, and September 30, 2013.

109.    The Restatement also disclosed that the new management installed after the terminations of Schorsch, Block and Beeson had re-evaluated the "Company's internal control over financial reporting and its disclosure controls and procedures and concluded that they were not effective at December 31, 2013 due to certain material weaknesses." The Audit Committee admitted for the first time that the "material weaknesses had not been remediated, and additional weaknesses in [its] internal control over financial reporting existed, at March 31, 2014, June 30, 2014 and September 30, 2014 [and] at those dates, [ARCP's] disclosure controls and procedures were not effective." The Restatement also revealed that AFFO in the Company's SEC filings and other financial communications was overstated for fiscal year 2011, fiscal year 2012, fiscal year 2013 (including each fiscal quarter of 2013), and the first two fiscal quarters of 2014.

110.    The Restatement is effectively an admission that the Company's financial statements and certain of its press releases were materially false and misleading.

111.    In light of the extensive nature of the accounting malfeasance, it could not have occurred unless the Former Officer Defendants willfully neglected their fiduciary duties of care

and loyalty with respect to the financial statements in question and Grant Thornton violated professional standards, engaged in negligence and breached its contractual duties to ARCP and if Grant Thornton had not acted negligently and breached its contract to perform reviews and audits in good faith and according to the appropriate auditing principles.

### 1.    The Restatement Was Material

112.    The Restatement was material.  It was based upon a multitude of continuous and repeated GAAP violations over a period of years which fall into broad two categories: (1) those that clouded transactions with Schorsch-related parties and (2) those that delayed, omitted or mischaracterized expenses which then inflated other metrics used to determine the Company's performance.

113.    Specifically, the financial statements filed on the 2013 Form 10-K for the year and Forms 10-Q in 2013 and 2014, during the Relevant Period for this Action, were materially inaccurate in the following manner in that ARCP improperly omitted expenses, understating losses

114.    GAAP requires that an entity recognize all income and expenses, even irregularly occurring losses or costs, in the results of operations in the period in which they are incurred, thereby avoiding a presentation of a more or less favorable report of performance than is justified. [10]

115.    The Company's financials during the period failed to properly classify or misclassified expenses in violation of GAAP as follows:

### Bonus Expense

- The Company failed to properly account for bonus expenses of $1.8 million incurred in 2013, in contravention of ASC Topic 710-10, *Salaries, Wages and Bonuses*, which requires compensation to be accrued during the performance period.

- ARCP also failed to record bonuses of $5.8 million during 2Q14.

### Deferred Accounting for Stock Awards Granted

- The documentation of awards granted to ARCP directors provided for accelerated vesting of shares upon voluntary resignation of the directors. As a result, there was no required service period for the vesting of such awards and, thus, GAAP requires that the full amount be expensed[12] over the service period. Thus, awards that vest immediately should have been recognized at the grant date. In connection with the Restatement, the Company restated the accounting by recording $3.3 million as general and administrative expense during 1Q14, which had not been properly expensed in the correct period.

### Deferred Merger-Related Transfer Tax Liability

- ARCP improperly understated the Company's loss by excluding certain merger and non-routine transaction related expenses during 2013 by failing to record a controlling interest transfer tax liability upon consummation of the ARCT III Merger and the Company's merger with CapLease totaling $1.1 million and $8.9 million for 1Q13 and FY13, respectively.

### Deferred Depreciation and Acquisition Related Expenses

- ARCP overstated its 1Q14 financial results by delaying depreciation and acquisition related expenses by $2.3 million and $0.6 million, respectively, based on its accounting for certain properties acquired in 2013.

- ARCP failed to properly record $6.0 million of depreciation expense for real estate properties acquired during 1Q14, and that this too had been expensed in 2Q14 instead of 1Q14.

### Deferred Interest Expense

- ARCP understated interest expense related to a swap by $1.4 million in 1Q14, in violation of ASC Topic 835, *Interest*.

### Other Expenses

- ARCP improperly failed to record "$14.5 million of merger and other non-routine transaction related expenses [for] the year ended December 31, 2013." ARCP also failed to record general and administrative expenses of $1.7 million and $0.9 million in 1Q14 and 2Q14, respectively.

### ARCP Improperly Capitalized Expenses Relating to Schorsch Entities with No Evidence

- The Company also improperly capitalized non-capitalizable expenses as assets during 1Q13 and improperly amortized them over time rather than properly expensing them at the time they were incurred in relation to Schorsch-related entities. ASC Topic 805, Business Combinations, requires that acquisition-related costs be recorded as expenses in the periods in which the costs are incurred. Nonetheless, there was no evidence of acquisitions of furniture, fixture or other equipment from Schorsch-related entities which were capitalized, thereby inflating the Company's financial performance.

### 2.    ARCP Failed to Properly Account for and Disclose Related Party Transactions and Paid Schorsch-Related Entities for Nothing

116.    These financials also failed to properly account for and disclose Schorsch-related party transactions and demonstrated Schorsch's waste of the Company's assets. The Restatement disclosed:

> The identified certain payments made by the Company to the Former Manager or its affiliates that were not sufficiently documented or otherwise warrant scrutiny. In November 2014, as a result of the Audit Committee investigation, the Company terminated a lease with an affiliate of the Former Manager for space in a building located in Newport, Rhode Island. The Company, which never occupied the building, was reimbursed for certain leasehold improvements and other costs by delivery of 916,423 OP Units valued at approximately $8.5 million, which were retired. The Company is considering whether it has a right to seek recovery for any other such payments and, if so, its alternatives for seeking recovery. No asset has been recognized in the financial statements related to any potential recovery.

117.    This was owing to ARCP's poor internal controls and books and records that were intertwined with the Schorsch-related entities.  As indicated in the March 2, 2015 10/A:

> The Company is working closely with outside counsel to terminate its remaining relationships with affiliates of its Former Manager, including ARC Capital, LLC ("ARC") and RCS Capital Corporation, and to disentangle its internal control framework from the affiliated entities. The Company is seeking to obtain copies of all of its books and records held by ARC and to eliminate all human resource, information technology and other overlapping departmental services.

118.   The Restatement also identified internal control deficiencies and failures concerning Related Party Transactions, including:

> Related Party Transactions and Conflicts of Interest – The Company did not maintain the appropriate controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates. Without the appropriate controls, the Company made certain payments to the Former Manager and its affiliates that were not sufficiently documented or that otherwise warrant scrutiny.

119.   ARCP's financial statements during the Relevant Period filed with the SEC as part of the Company's Forms 10-Ks and 10-Qs failed to disclose material related party transactions in detail in the notes to the financial statements. For example, among other things, ARCP did not disclose that "the Company made certain payments to the Former Manager and its affiliates that were not sufficiently documented or that otherwise warrant scrutiny" and that such transactions constituted a waste of the Company's assets.   Thus, the financial statements and notes thereto failed to provide adequate information regarding the description of the transactions, the nature of the relationships involved, the amounts involved, the terms and manner of settlement of the transactions, and such other information as may be deemed necessary to understand the effects of the significant and unusual transactions on the financial statements as required by GAAP.

### 3.   ARCP Failed to Properly Record Acquisition Merger and Other Non-Routine Transaction Related Expenses during 2013 and 2014

120.   According to the Restatement, ARCP failed to properly record acquisition merger and other non-routine transaction related expenses in 2013 and 2014, the period in which it was engaged in making many acquisitions. Acquisition related costs are costs the acquirer incurs to effect a business combination.   The acquirer accounts for merger-related costs as expenses in the

periods in which the costs are incurred and the services are received.[11] In misclassifying general and administrative expenses as merger-related, ARCP violated fundamental tenets of GAAP.[12]

121.    ARCP's improper accounting of merger-related expenses concealed the fact that general and administrative expenses had catapulted to $123.2 million from the previous year's $5.5 million.

### 4.    ARCP Failed to Properly Record Timely Impairment Charges of its Long Lived Assets

122.    ARCP's financial statements were also materially misstated as a result of the Company's failure to write-down the value of its long-lived assets.[13]

123.    The Company's Form 10-K for the year ended December 31, 2013 represented that its accounting for long-lived assets was consistent with GAAP:

> **Impairment of Long Lived Assets**
>
> Periodically, or when circumstances indicate the carrying value of a property may not be recoverable, the Company assesses real estate investments for impairment. This review is based on an estimate of the future undiscounted cash flows, excluding interest charges, expected to result from the property's use and eventual disposition. ***These estimates consider factors such as expected future operating income, market and other applicable trends and residual value, as well as the effects of leasing demand, competition and other factors.*** If impairment exists due to the inability to recover the carrying value of a property, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the property. The Company has determined that the significant inputs used to estimate the fair value of the property full within Level 2 or Level 3 of fair value hierarchy.[14]

---

[11] ASC Topic 805, *Business Combinations*.

[12] *See* Financial Accounting Standards Board, Concepts Statements ("CON") No. 2, *Qualitative Characteristics of Accounting Information Reliability* ¶¶111, 117.

[13] See ASC Topic 360, *Impairment and Disposal of Long-Lived Assets* ("ASC 360").

[14] ARCP 2013 10-K at F-13 (Feb. 27, 2014) (emphasis added) (all emphasis added, unless otherwise noted).

124.   According to the Restatement, that was not true as the Company failed to monitor events and changes in circumstances:

**Impairment of Real Estate**

The Company originally believed that the risk of impairment of its real estate and related assets was mitigated by the fact that substantially all of the Company's real estate portfolio had been acquired in 2012 and 2013. As a result, the *Company had failed to monitor events and changes in circumstances that could indicate that the carrying amount of its real estate and related assets may not be recoverable* . . . .

125.   Additionally, ARCP failed to properly classify certain property as held for sale as of June 30, 2014 in conflict with GAAP, specifically ASC 360-10-35-43.

### 5.   ARCP Failed to Properly Account for Goodwill in Connection with the CapLease Merger

126.   The Company improperly accounted for goodwill in connection with the CapLease Merger, thus overstating goodwill and understating the net loss on dispositions in 2014.

127.   According to GAAP, the measurement period in a business combination is the period that is required to identify and measure the fair value of the identifiable assets acquired, the liabilities assumed, and any non-controlling interest in the acquired business.[15] The acquirer must retrospectively adjust the accounting for information obtained during the measurement period about facts and circumstances that existed as of the acquisition date.  The measurement period ends as of the earlier of (a) one year from the acquisition date or (b) the date when the acquirer receives the information necessary to complete the business combination accounting.[16]

---

[15] ASC 805-10-25-14.

[16] See ASC 805-10-25.

In its 2013 10-K, the Company represented that "[t]he CapLease Merger has been accounted for under the acquisition method of accounting under U.S. GAAP."

128.    According to the Restatement:

> Subsequent to the CapLease Merger, the ***Company disposed of certain properties acquired in that transaction. The disposition of such properties resulted in a net loss on disposition; however, the Company accounted for such losses by adjusting its purchase price allocation to increase the amount of goodwill and decrease the associated real estate investments recorded in connection with the CapLease Merger by $12.0 million*** when it reissued its recasted financial statements to reflect the common control merger with ARCT IV. ***The Company has determined that there was not sufficient evidence to support adjusting its goodwill as a measurement period adjustment.*** As a result, the Company has reversed the measurement period adjustments that were made to goodwill and related assets and liabilities acquired in the CapLease Merger and recognized a net loss on the dispositions in 2014 when the dispositions occurred.

129.    The Restatement also identified other instances of improper accounting for goodwill and losses on disposals of real estate in violation of GAAP, including ASC Topic 350, *Intangibles – Goodwill and Other*, ASC Topic 360, *Property, Plant, and Equipment*, ASC Topic 610, *Other Income*, and ASC Topic 805, *Business Combinations*.

**6.    ARCP's Other GAAP Failures**

130.    In addition to the multitude of GAAP violations described above, ARCP engaged in a number of other accounting improprieties described in the Company's amended SEC filings and addressed by the Restatement including, but not limited to, the following:

- failing to properly record distributions on long-term incentive plan units;

- improperly classifying amounts due to affiliates as accounts payable and accrued expenses, thereby concealing that these expenses were being paid to other Schorsch-related entities;

- improperly excluding certain expenses from the calculation of the net loss attributable to non-controlling interest holders;

- improperly accounting for gains/losses on derivative instruments (specifically, interest rate swaps);

- understating interest expense by improperly recording the same credit twice; and

- misclassifying interest expense, debt extinguishment costs and loss on disposition of properties.

**E.     The Company's Public Filings Did Not Comply with SEC Regulations**

**1.     Because of GAAP, ARCP' Financials During the Relevant Period Violated SEC Regulations and Constituted Securities Fraud**

131.    As a consequence of these accounting errors, the Company's financial statements filed during the year ended December 31, 2013 (including each quarter of 2013) and the first two quarters of 2014 failed to comply with SEC regulations and were presumptively misleading and inaccurate according to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)).

**2.     ARCP's Financial Also Materially Misstated A Non-GAAP Metric— the AFFO**

132.    ARCP's financial statements and other public disclosures also included material misstatements or omissions concerning the Company's reporting of AFFO, which is not a GAAP measure but a measure which Grant Thornton and certain of the Former Officer Directors reviewed, thus violating SEC regulations.

133.    The Restatement admits that AFFO was overstated during the year ended December 31, 2013 (including each quarter of 2013) and through the second quarter of 2014.

134.    ARCP consistently represented in the Company 10-K and 10-Qs that FFO and AFFO were "useful indicators" of its performance.

135.    The Company stated "that the use of FFO and AFFO, together with the required U.S. GAAP presentations provide a more complete understanding of our performance relative to

our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities."[17]

136.   ARCP misleadingly stated that it calculated AFFO as follows:

> In calculating AFFO, we exclude expenses, which under U.S. GAAP are characterized as operating expenses in determining operating net income. These expenses are paid in cash by us, and therefore such funds will not be available to distribute to investors. . . . . .[U]nder U.S. GAAP, certain contemplated noncash fair value and other non-cash adjustments are considered operating noncash adjustments to net income in determining cash flow from operating activities. In addition, we view fair value adjustments as items which are unrealized and may not ultimately be realized. We view both gains and losses from fair value adjustments as items which are not reflective of ongoing operations and are therefore typically adjusted for when assessing operating performance. Excluding income and expense items detailed above from our calculation of AFFO provides information consistent with management's analysis of the operating performance of the properties. Additionally, fair value adjustments, which are based on the impact of current market fluctuations and underlying assessments of general market conditions, but can also result from operational factors such as rental and occupancy rates, may not be directly related or attributable to our current operating performance. By excluding such changes that may reflect anticipated and unrealized gains or losses, we believe AFFO provides useful supplemental information.

137.   As discussed in the Company's October 30, 2014 Shareholder/Analyst Call, ARCP was supposed to be using the "net method" in its reporting of AFFO.  During the call, executives described the net method as follows:

> [W]hen the add-backs were done, they were done at 100% instead of 96% -roughly 96.5%. That created too much add-back where presentation for AFFO would be too high by roughly $17.6 million. That was roughly $0.03 overstatement of AFFO per share for the quarter in that presentation.

---

[17] ARCP 1st quarter 2014 10-Q at 65 (May 8, 2014).

### 3.    ARCP's Material Weakness in Internal Controls Violated SEC Regulations

138.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(a) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit [the] preparation of financial statements in conformity with [GAAP]." These provisions require public companies to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

139.    As acknowledged in the Company's SEC filings, management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in §§13a-15(f) and 15d-15(f) under the Exchange Act.  The Restatement indicates that ARCP's internal controls over financial reporting were plagued with pervasive material weaknesses dating back to at least 2013.  The Restatement identified the following broad areas of material weaknesses of the Company's internal control over financial reporting:  related party transactions and conflicts of interest; equity-based compensation; and significant deficiencies within business process-level control activities.

140.    Thus, the Former Officer Defendants caused or permitted ARCP to violate §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its expenses and income.  Moreover, ARCP's materially inaccurate and false records were not an isolated or unique instance because they were improperly maintained for multiple reporting periods, dating back to at least 2013.

141.   In addition, ARCP violated §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  For example, the Former Officer Directors caused or permitted ARCP to fail to ensure that controls were in place to develop necessary accounting policies and procedures, to properly monitor related-party transactions, to review equity awards for compliance with authorized terms, and to review and approve critical and significant estimates.  The Former Officer Defendants caused or permitted the Company to fail to ensure that transactions were reported in accordance with its own policies and with GAAP.

## GRANT THORNTON COMMITTED NEGLIGENCE, GROSS NEGLIGENCE AND BREACHED ITS CONTRACT WITH ARCP

142.   At all times relevant hereto, Grant Thornton, as the auditor of ARCP and an independent certified public accounting firm, owed a duty to ARCP and its shareholders to exercise that degree of due professional care, proficiency, and diligence required by reasonably prudent independent public accountants under the same or similar circumstances. (For purposes of this Complaint, reference is made to Professional Standards issued by the Public Company Accounting Oversight Board (the "PCAOB Standards"), particularly the section entitled Statement on Auditing Standards and Related Auditing Interpretations ("AU").)

143.   Despite Grant Thornton's long-standing relationship as the Company's auditor, its purported expertise in the REIT Industry and knowledge of the importance of the AFFO to analysts and investors, Grant Thornton failed in its role as auditor of year-end financial statements and reviewer of interim financial statements, acted negligently, breached its contract with ARCP, and committed malpractice.

A.   **Grant Thornton Failed to Render an Accurate Audit Report with Respect to ARCP's 2013 Annual Financial Statements**

144.   With respect to ARCP's financial statements for the years ended December 31, 2013, Grant Thornton acted negligently, breached its contract and committed malpractice by violating PCAOB Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP.[18] Grant Thornton's opinion negligently represented that ARCP's financial statements for the years ended December 31, 2013 were presented in conformity with GAAP when they were not, for the reasons herein alleged.

145.   The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work.  The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with PCAOB Standards.[19]

146.   For instance, Grant Thornton issued its audit opinion dated February 27, 2014 on ARCP's 2013 financial statements.  Grant Thornton's opinion stated that ARCP's financial statements were presented in conformity with GAAP and that Grant Thornton's audit was performed in accordance with PCAOB Standards. Grant Thornton did not render an accurate audit report for the Company's financial statements as of December 31, 2013, and thus did not exercise due professional care, because ARCP'S financial statements were not in conformity with GAAP, and because Grant Thornton failed to perform sufficient procedures to audit the Company's financial statements in accordance with PCAOB Standards.  Grant Thornton's statements with respect to ARCP's December 31, 2013 financials were negligently made because: (a) the financial statements had not been prepared in conformity with GAAP in

---

[18] AU § 508.04.

[19] AU § 508.07.

numerous respects and did not present fairly, in all material respects, the financial position of ARCP as of December 31, 2013, and the results of the Company's operations and cash flow for the year ended December 31, 2013; and (b) Grant Thornton had not audited ARCP's 2013 financial statements in accordance with PCAOB Standards for the reasons set forth below.

147.    Additionally, ARCP suffered from material weaknesses in the Company's internal controls over financial reporting and its disclosure controls and procedures.

**B.      Grant Thornton Failed to Conduct the ARCP 2013 Audit in Accordance with PCAOB Standards**

148.    PCAOB Standards require auditors to exercise due professional care in the planning and performance of the audit and the preparation of the report.[20] Auditors should be assigned and supervised commensurate with their level of knowledge, skill, and ability, so that they can evaluate the audit evidence they are examining. The auditor with final responsibility for the engagement should know, at a minimum, the relevant accounting and auditing standards and should be knowledgeable about the client.[21]

149.    Auditors must maintain an attitude of professional skepticism, which includes "a questioning mind and a critical assessment of audit evidence."[22] In addition, the auditor should "consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process."[23]

---

[20] AU § 230.01.

[21] AU § 230.06.

[22] AU § 230.07.

[23] AU § 230.08.

### 1. Grant Thornton Failed to Exercise the Requisite Level of Care in Auditing ARCP's Long-Lived Assets

150.   Grant Thornton failed to exercise reasonable care in auditing ARCP's long-lived assets – real estate. For example, the Company has admitted that its previously filed financial statements for the year ended December 31, 2013 ("2013 Financials") were materially misstated as a result of failure to take impairment charges related to long-lived assets. An auditor exercising reasonable professional skill and judgment would have discussed with the Company the policies and procedures which the Company used to identify asset impairments and would have determined, as admitted by the Company in the Restatement, that it "did not have consistent policies and procedures throughout its offices relating to . . . testing for impairment."

151.   Grant Thornton violated General Standard No. 3 by failing to exercise professional skepticism, including failing to obtain and critically assess audit evidence with respect to the existence of conditions indicating that an asset may have been impaired. *See* ASC 360-10-35-21 for examples of circumstances that may indicate an asset may be impaired. According to the Restatement, the Company "failed to monitor events and changes in circumstances that could indicate that the carrying amount of its real estate and related assets may not be recoverable." Accordingly, Grant Thornton failed to exercise reasonable care, skill, prudence, and diligence generally recognized in the accounting profession by failing to uncover ARCP's lack of procedures and resulting misstatements, because of the materiality of the adjustments to the Company's long-lived assets.

### 2. Grant Thornton Failed to Exercise the Requisite Level of Care in Auditing ARCP's Related Party Transactions Pertinent to ARCP's 2013 Financials

152.   PCAOB Standards dealing directly with related-party transactions require that "an auditor should view related-party transactions within the framework of existing [accounting]

46

pronouncements, placing primary emphasis on the adequacy of disclosure."[24] An auditor exercising reasonable professional skill and judgment would have known that the audit of related parties is important because of (1) the requirement under GAAP to disclose material related party transactions and certain control relationships, (2) the potential for distorted or misleading financial statements in the absence of adequate disclosure, and (3) the instances of fraudulent financial reporting and misappropriation of assets that have been facilitated by the use of an undisclosed related party.

153.   To comply with PCAOB Standards, Grant Thornton was required to evaluate all the information available concerning the related party transaction or control relationship and satisfy itself on the basis of professional judgment that it was adequately disclosed in the financial statements.[25] ARCP failed to disclose various related party transactions, only to disclose them in the Restatement, including: Management Fees to Affiliates; General and Administrative Expenses, including equity awards; and Amounts Due to Affiliates.

154.   Nevertheless, Grant Thornton issued an audit report on the 2013 Financials containing an unqualified opinion even though ARCP failed to properly disclose the material related-party transactions in its financial statements as required by GAAP.  These audit failures by Grant Thornton were particularly egregious considering that it performed services for many other Schorsch-related entities which had engaged in transactions with ARCP.

155.   Grant Thornton also failed to exercise the requisite level of care or perform a critical assessment of the audit evidence.  Well before the audit report was issued, Grant Thornton was aware that, as admitted by the Company, ARCP "did not maintain the appropriate

---

[24] AU § 334.02.

[25] AU § 334.11.

controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates."[26]

156.   Grant Thornton failed to exercise an appropriate level of skepticism and failed to obtain sufficient competent evidential matter concerning related-party transactions and thus did not exercise due professional care.  Indeed, the Company has admitted that "certain payments made by the Company to the Former Manager or its affiliates that were not sufficiently documented."   An auditor exercising reasonable professional skill and judgment would have required more complete disclosure and, if such disclosure was not made, would have issued a qualified or adverse opinion – either of which would have prompted ARCP to take immediate action.

**C.      Grant Thornton Ignored the Risks of a Material Misstatement of ARCP's 2013 Financials**

157.   According to PCAOB Standards, the auditor must "perform risk assessment procedures that are sufficient to provide a reasonable basis for identifying and assessing the risks of material misstatement, whether due to error or fraud, and designing further audit procedures"[27] The PCAOB Standards require the auditor to perform the audit in a manner calculated to obtain such assurances.[28] Thus, "audit procedures that are necessary to identify and appropriately assess the risks of material misstatement include consideration of both external factors and company specific factors."[29]

---

[26] ARCP 2013 10-K/A at 102.

[27] AU § 316.01.

[28] AU § 316.01.

[29] AS No.12 ¶5.

158.    Risk assessments should be made with consideration of applicable risk factors.[30] An auditor exercising due professional care would not have ignored the numerous risks relevant to financial reporting, including events and circumstances that occurred or existed at ARCP which adversely affected ARCP's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.

159.    Grant Thornton ignored a variety of risk factors relating to misstatements arising from fraudulent financial reporting, such as unusually rapid growth or profitability.[31] Grant Thornton was well aware that ARCP experienced tremendous growth during the last few years, with total assets increasing from $132 million at December 31, 2011 to over $21 billion at June 30, 2014.  In fact, between 3Q13 and 4Q13 the Company's enterprise value[32] doubled from $3.4 billion to $7.8 billion and then tripled between 4Q13 and 1Q2014 to $21.6 billion.

160.    In the Restatement, the Company admitted that as a result of the "large portfolio acquisitions, the Company experienced significant growth and increases in the complexity of its financial reporting and number of non-routine transactions," which "demanded an enhanced control environment."  During 2013, ARCP entered into three transactions:  the transition to self-management, announced in August 2013; the acquisition of ARCT IV, announced in July 2013; and the acquisition of Cole, announced in October 2013.  According to the Company, "the complexity of the Company's transactions and the need for accounting judgments and estimates became more prevalent and had a severe impact on the Company's control environment."  A July

---

[30] *See* AS No. 12 ¶65.

[31] AU § 316.85.

[32] Enterprise value is calculated as the market capitalization plus debt, minority interest and preferred shares, minus total cash and cash equivalents.
http://www.investopedia.com/terms/e/enterprisevalue.asp#ixzz3YtuRi3eE

1, 2014 *Motley Fool* article pointed out: "If there was an award being handed out for explosively growing companies that reward would surely go to American Realty Capital Properties."

161.    Grant Thornton also ignored that "[d]omination of management by a single person," a risk factor relating to misstatements arising from fraudulent financial reporting.[33] Grant Thornton was aware that Schorsch dominated the Company's board of directors, management, and financial reporting.  According to the McAlister Complaint, Schorsch was heavily involved in the Company's financial reporting, directed Block "to reallocate the funds used to calculate the AFFO and shift the numbers on the 2014 second quarter 10-Q,"[34] and directed "chang[ing] the beginning point of for its AFFO calculation."[35] Grant Thornton ignored Schorsch's "excessive participation in or preoccupation with the selection of accounting principles," a risk factor relating to misstatements arising from fraudulent financial reporting.[36]

162.    Grant Thornton also ignored that the Company was under pressure to meet "[p]rofitability or trend level expectations of investment analysts, institutional investors, significant creditors, or other external parties" – a risk factor relating to misstatements arising from fraudulent financial reporting.  According to the Restatement, "[s]enior management considered AFFO to be an important metric used by analysts and investors in evaluating the Company's performance and, for the first two quarters of 2014, sought to maintain reported AFFO within the 2014 guidance range of $1.13 to $1.19 per share announced at the end of 2013," and as a result "the pressure of market expectations inherent in announcing AFFO per share guidance for 2014, demanded an enhanced control environment."

---

[33] AU § 316.85.

[34] McAlister Compl.

[35] McAlister Par. 3 Compl. Par. 3¶ 3.

[36] AU § 316.85.

163.   Grant Thornton failed to evaluate whether the Company's controls sufficiently addressed these identified risks of material misstatements due to fraud and whether the Company had controls intended to address the risk that management could override other controls. Controls that might address these risks include:  (1) controls over related party transactions; (2) controls related to significant management estimates; and (3) controls that mitigate incentives for, and pressures on, management to falsify or inappropriately manage financial results.[37] A reasonable auditor exercising reasonable care would not have ignored ARCP's emphasis on growth coupled with utterly flawed internal controls.

164.   Grant Thornton also did not exercise reasonable care in not knowing that the Company had failed to implement effective whistleblower provisions as required under Section 301 of SOX.  Grant Thornton understood the critical importance of a whistleblower program, as discussed in an article entitled, "Hear That Whistle Blowing! Establishing An Effective Complaint Handling Process", written by a Grant Thornton partner.  The article in pertinent part, states:

> It is important to understand the role whistleblower complaint handling plays in deterring corporate fraud. Controls on the front end that prevent or deter fraud are critical — after all, the cheapest fraud is one that never happens.

165.   Grant Thornton was at least negligent in not knowing that ARCP's "Duty to Report" procedures which were in place at the time of the wrongdoing were ineffective because they called for reporting concerns of accounting or auditing matters "directly to the Chief Executive Officer of the Company" – which in this case was one of the persons whose control over the Company put the Company at risk.  Grant Thornton failed to exercise due care in not

---

[37] AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements.*

advising the Company that it should "[e]stablish an 'early warning system' to bring accounting, internal accounting control and auditing matters to the attention of the audit committee in time to prevent, or detect and correct, possible problems before they cause serious harm or damage."[38] Indeed, not until July 24, 2014 did the Company implement effective whistleblower procedures.

166.    Accordingly, Grant Thornton failed to exercise reasonable care, skill, prudence, and diligence generally recognized in the accounting profession by ignoring the risk factors relating to misstatements arising from fraudulent financial reporting.   ARCP suffered from material weaknesses in internal controls, resulting in a variety of GAAP violations and improper reporting of AFFO.

### D.    Grant Thornton Failed to Obtain an Understanding of ARCP's Internal Controls

167.    Grant Thornton represented that "the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control-Integrated Framework issued by COSO." Contrary to Grant Thornton's assertions about the Company's internal controls, the Restatement disclosed the following:

> In light of the findings of the Audit Committee's investigation and a review by the Company in connection with the preparation of the restatements, the Company's new management re-evaluated *the Company's internal control over financial reporting and its disclosure controls and procedures and concluded that they were not effective at December 31, 2013.* These material weaknesses had not been remediated, and additional material weaknesses in our internal control over financial reporting existed, at March 31, 2014, June 30, 2014 and September 30, 2014. In addition, at those dates, our disclosure controls and procedures were not effective.

---

[38] *Id.*

168.   The Restatement also disclosed that the Company suffered from material weaknesses in disclosure controls and procedures.

169.   Accordingly, Grant Thornton failed to exercise reasonable care, skill, prudence, and diligence generally recognized in the accounting profession by failing to uncover the multitude of material internal control weaknesses and rendering a materially false statement asserting that ARCP's internal controls over financial reporting were effective as of December 31, 2013, when in fact they were not effective.

**E.     Grant Thornton Failed to Exercise Reasonable Care in Reviewing ARCP's Financial Information in its Interim Reports**

170.   Grant Thornton failed to exercise reasonable care in reviewing ARCP's financial statements for quarters ended March 31, 2014 and 2013, June 30, 2014 and 2013, and September 30, 2013, filed with the quarterly reports on Form 10-Q.  The SEC requires auditors to review a public company's interim financial information before the company files its quarterly report on Form 10-Q with the SEC for each of the first three quarters of the company's fiscal year.  In addition, certain issuers, pursuant to item 302(a) of Regulation S-K, are required to include selected quarterly financial data in their annual (and certain other) filings with the SEC. Moreover, Grant Thornton failed to recognize a significant accounting change made by the Company in the fourth quarter of 2013, at a time when it was performing the Company's year-end audit, and Grant Thornton ignored that change when told about it by McAlister.

171.   A review of a company's interim financial information is required for the fourth quarter for issuers, even though the company does not file a report on Form 10-Q for that quarter.

172.   AU Section 722, *Interim Financial Information*, requires that auditors conducting a review of interim financial information should perform, among other things:

- Inquiries concerning internal controls, especially changes in internal controls since the most recent financial statement audit or review;

- Reading the interim financial information for conformity with generally accepted accounting principles; and

- Inquiries of officers and other executives having responsibility for financial and accounting matters concerning whether the interim financial information has been prepared in conformity with GAAP consistently applied.

173.   AU Section 722 also states that the three general standards in AU Section 150.02 apply to reviews of interim financial information conducted in accordance with this section.

a.      The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

b.      In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.

c.      .Due professional care is to be exercised in the performance of the audit and the preparation of the report.

174.   The auditor should make inquiries and perform other review procedures when conducting a review of interim financial information, including:

Read other information in documents containing the interim financial information to consider whether such information or the manner of its presentation is materially inconsistent with the interim financial information. If the auditor concludes that a material inconsistency exists or becomes aware of information that the auditor believes is a material misstatement of fact, the auditor should take action based on the auditor's professional judgment.[39]

175.   In order to plan and conduct a review engagement, auditors should obtain an understanding of the entity and its environment, including its internal control as it relates to the preparation and fair presentation of both annual and interim financial information.[40]

---

[39] AICPA *Interim Financial Information* AU-C §930.14.

[40] AICPA *Interim Financial Information* AU-C §930.11.

**F.      Grant Thornton's Failures Related to ARCP's AFFO in its Interim Reports**

176.    As discussed above, ARCP improperly inflated AFFO in its interim reports filed in 2013 and 2014 through a variety of means including, among other things, changing its methodology of reporting its AFFO whereby it ceased pro-rating the added-back-to AFFO nonrecurring transaction and deferred financing costs and began to increase the AFFO by the entirety of the added-back costs, including the portion that should have been attributed to non-controlling interests in the operating partnership, ARC Properties Operating Partnership LP.

177.    Grant Thornton knew AFFO is a significant metric for REITs such as ARCP.  In a December 4, 2013 article published by Grant Thornton titled "Evaluating REITs: FFO, AFFO or MFFO?," the firm acknowledged that "because of the unique features of the real estate industry, GAAP measures based on depreciation are not necessarily value relevant for REITs.  Many investors therefore turn to non-GAAP metrics, which REIT industry groups support for use in communications to stakeholders and financial disclosures."  (footnotes omitted).

178.    Grant Thornton breached is contractual duties and was negligent in fulfilling its obligations to ARCP, particularly given the fact that McAlister specifically informed Grant Thornton of the accounting issues regarding the AFFO.

179.    Accordingly, Grant Thornton failed to exercise reasonable care, skill, prudence, and diligence generally recognized in the accounting profession by failing to uncover the improper AFFO reporting because of the materiality of the adjustments and the significance of AFFO to investors.

**G.      Grant Thornton Ignored Red Flags During its 2013 Audit and Reviews of the 2014 Interim Financials**

180.    Grant Thornton was also negligent in failing to conduct a further investigation of ARCP's financials in light of obvious red flags that the Company was engaged in accounting

improprieties.   First, as McAlister asserted in her Complaint, the Company changed its methodology of reporting its AFFO relative to previous financial quarters in or around February 2014.  This was at a time when Grant Thornton was engaged to perform 2013 year-end audit.[41] A reasonably prudent independent public accountant under the same or similar circumstances exercising due professional care, proficiency, and diligence would have uncovered the change due to the materiality of AFFO to the Company and investors.   Grant Thornton knew the importance of AFFO, as the long-standing auditor of ARCP and its touted experience in the REIT industry.

181.   Second, during the second quarter of 2014, the Company changed the starting point of its AFFO calculation from "Net loss attributable to stockholders (in accordance with U.S. GAAP)," as reported in 1Q14, to "Net loss (in accordance with U.S. GAAP)."

182.   Although the change was not improper per se, according to the McAlister Complaint, the change was done to obfuscate the improper "add-backs of non-recurring transactions and deferred financing costs."[42]

183.   Despite the changes the Company made to AFFO during the second quarter of 2014, Grant Thornton failed to exercise reasonable care and diligence by failing to identify the inconsistencies and make additional inquiries of management and the Board, especially after it was told of this change by McAlister.  During the October 30, 2014 shareholder/analyst call, the Company also admitted that the improper accounting was done "in order to conceal the error from the first quarter."

---

[41] McAlister Compl. ¶30.
[42] McAlister Compl. ¶ 41.

184.    The SEC permits companies to present non-GAAP financial measures in their periodic reports filed under the Securities Exchange Act of 1934, subject to compliance with Regulation G,[43] including press releases, investor presentations and conference calls, whether such disclosure is made in print, orally, telephonically, by webcast or by broadcast.

185.    Regulation G includes the following discussion regarding consistency of calculating and presenting non-GAAP financial measures:

> [R]egistrants should consider whether a change in the method of calculating or presenting a non-GAAP financial measure from one period to another, without a complete description of the change in that methodology, complies with the requirement of Regulation G that a registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

186.    An auditor exercising reasonable professional skill and judgment would have read the other information contained in the 10-Qs and would have identified the inconsistencies and made additional inquiries, especially after being contacted by McAlister.  Moreover, owing to Grant Thornton's longstanding professional relationship with ARCP and the numerous other engagements performed, Grant Thornton was well aware of ARCP's methodology for calculating AFFO.

187.    Third, prior to the filing of ARCP's second quarter 10-Q, McAlister "felt uncomfortable signing" the report and "emailed Jessica Estrada, a manager at Grant Thornton . .

---

[43] Regulation G was adopted by the SEC in 2003, as part of Sarbanes Oxley, requiring public companies that disclose or release such non-GAAP financial measures to include, in that disclosure or release, a presentation of the most directly comparable GAAP financial measure and a reconciliation of the disclosed non-GAAP financial measure to the most directly comparable GAAP financial measure.  http://www.sec.gov/rules/final/33-8176.htm

. call[ing] attention to the manipulative accounting practice reflected in the Q2 report."[44] If the auditor becomes aware of matters involving identified or suspected noncompliance with laws and regulations whose effects should be considered when preparing interim financial information, the auditor should communicate the matters to those charged with governance.[45] McAlister, however was eventually told by Estrada and LeFleur "that she could sign and file the report 'as is.'"[46]

188.   Grant Thornton not only failed to comply with its own professional standards, but also breached its duty to the Company by failing to exercise that degree of due professional care, proficiency, and diligence required by reasonably prudent independent public accountants under the same or similar circumstances.  The Company, particularly the Audit Committee, relied on Grant Thornton to vet "any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function."[47]

189.   Despite the foregoing, Grant Thornton failed to conduct further investigation of these suspicious circumstances while performing its quarterly review procedures.  Accordingly, Grant Thornton failed to exercise reasonable care in reviewing ARCP's financial statements.

190.   Further, Grant Thornton failed to, among other things, investigate ARCP's change in its reporting methodology for AFFO during the year ended December 31, 2013, and during the first quarter of 2014, when the Company reported non-controlling interests on a net basis, to the second quarter of 2014, when the Company started reporting non-controlling interests on a gross

---

[44] McAlister Compl. ¶44.

[45] AU-C §930.27.

[46] McAlister Compl. ¶45.

[47] Charter §11.

basis; and failed to investigate McAlister's allegations of accounting improprieties – both occurring during the second quarter 2014.

191.   Grant Thornton failed to comply with its own professional standards and with industry standards by failing to take appropriate action after becoming aware of information believed to be material misstatement of fact.  The Company, particularly the Audit Committee, relied on Grant Thornton to vet "the quarterly financial statements . . ., including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."[51] Accordingly, Grant Thornton was negligent in not knowing the consequences of improper reporting of the AFFO.

192.   Grant Thornton also failed in its duty to adequately and properly review the Company's press releases during the Relevant Period. The Company issued materially false and misleading earnings press releases, as a result of the inflated AFFO. According to the Audit Committee Charter, "[t]he Committee shall discuss with . . . the Independent Auditor the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" and other non-GAAP information). . . ."

193.   Accordingly, Grant Thornton failed to exercise due care in its role as auditor because it was negligent in not knowing from its long-standing relationship as the Company's auditor, that: ARCP's financial statements were materially misstated as a result of the many GAAP violations; ARCP's AFFO was materially misstated since 2012 and possibly before; and ARCP suffered from material weaknesses in internal control over financial reporting.

## ARCP INCURRED SIGNIFICANT DAMAGES CAUSED BY GRANT THORNTON'S NEGLIGENCE AND THE FORMER OFFICE DEFENDANTS' BREACHES OF THEIR FIDUCIARY DUTIES

194.   The Former Officer Defendants' breaches of their fiduciary duties and Grant Thornton's negligence have caused and continue to cause ARCP to incur damages, including

significant costs, damage to its reputation, government investigations and private civil actions, and downgrades by Moody's and S&P.

195.    Moreover, during the Relevant Period, the Company experienced a waste of its assets and money was sucked out of it, as with each acquisition, that was enabled by the artificial inflation of the Company's shares, Schorsch, Kay and their related entities were paid millions of dollars for post transaction support services, financing coordination fees, the sale of furniture, fixtures and equipment, strategic advisory services, commissions and fees, subordinated distribution fees and management fees.   They also received fees through the Company's Multi-Year Performance Plan in which they allocated over $222 million to be paid to Company executives, including Schorsch and Block.

196.    Over a three year period, for instance, ARCP paid over $917 million in the form of commissions, fees and expenses to entities related to Schorsch and Kay.

197.    Another way the Schorsch and Block directed massive sums of money to themselves through the acquisition spree was via executive incentive payments. This is because the acquisitions were designed to expand ARCP's asset base in order to increase the basis for incentive compensation under the Company's Multi-Year Outperformance Plan (the "Outperformance Plan"). The Outperformance Plan was approved in October 2013 by the Compensation Committee which allocated 42.5% of a $120 million compensation pool under the Outperformance Plan to defendant Schorsch alone.

198.    However, defendants Schorsch and Block, apparently unsatisfied with this absurd level of compensation, subsequently increased the Outperformance Plan by $100 million by unilaterally altering the plan and disseminating a proxy statement stating the maximum award value of the Plan was $222.1 million.

199.    The Outperformance Plan is designed with two elements, an "absolute" metric and a "relative" metric. Both of these are measured over a three-year period based on total returns to stockholders including stock price increase (if any) and common stock distributions.

200.    If ARCP achieved a total return to stockholders of more than 7% a year, the plan would pay out 4% of the dollar amount of the return. If the Company's annual performance exceeded the median total return of a peer group of companies by 6% or more, the Plan would also pay out an additional 4% of that excess total return. Amazingly, the Outperformance Plan provided that defendants, including Schorsch and Block, would receive 50% of their target incentive compensation under this prong of the Plan even if ARCP posted a zero percent total return,

201.    Notably, the Company's shareholders overwhelmingly rejected the Outperformance Plan in their non-binding advisory vote at the 2014 annual meeting of shareholders. Of the approximately 413 million shares represented, only 32.4% voted in favor of the Plan, Defendants ignored the shareholder vote and apparently subsequently adopted the Plan even though the shareholders had rejected it and defendants Schorsch and Block had arbitrarily increased its value by over 80%.   This is evidenced by the December 12, 2014 agreement between defendant Schorsch and ARCP in connection with his resignation referring to the "Award Agreement dated January 8, 2014, under the ARCP 2014 Multi-Year Outperformance Plan."

202.    The Outperformance Plan entitling defendant Schorsch to such startling sums of money set forth above was not the full extent of his compensation, however. He was also entitled to:

      (a)    a guaranteed base salary of $1.1 million 2014;

(b)    an estimated $8.8 million cash bonus and equity awards;

(c)    a "retention grant" of $24.9 million, paid over nine years in installments of $2.8 million.

203.    Thus, if Schorsch achieved only the mid-range of his compensation under the Outperformance Plan, he was entitled to approximately $28.5 million in 2014 – more than two dozen times his base salary.

204.    ARCP will continue to expend significant sums as a consequence of the Defendants' wrongdoing alleged above.  These expenditures include, but are not limited to, the costs and expenses incurred by the Company in having to defend the Securities Action, without having brought a claim against Grant Thornton or the Former Officer Defendants for all or a portion of the damages the Company will sustain and from the various investigations.  In this regard, ARCP incurred significant costs to investigate its accounting and internal controls issues by retaining independent counsel, Weil, Gotshal & Manges LLP, and independent forensic accountants, Ernst & Young LLP.   Furthermore, ARCP is the subject of government investigations which are on-going as of this writing, including by the FBI, the SEC and state regulators.

205.    Damages were incurred in that ARCP may be required to pay a substantial judgment or settlement in connection with the securities fraud litigation.

206.    ARCP incurred significant damages in connection with the restatement of its various financial statements.

207.    The Massachusetts Securities Division ("MSD") has also launched an investigation into Realty Capital Securities, Schorsch's wholesaling broker-dealer arm. According to a November 7, 2014 *Investment News* article, "the investigation is focused on what

information was given to investors who bought the REITs and what investors were told about accounting at the REITs."  On December 19, 2014, the MSD said it was widening its investigation of Schorsch's companies and had sent subpoenas to officials at RCAP, ARC and ARCP.  According to a December 19, 2014 *Investment News* article, "[t]he subpoenas were 'to determine the extent of their knowledge in the matters brought up in the defamation suit.'"  The investigations are not yet resolved.

### A.     Moody's and S&P Downgrade ARCP's Ratings

208.     ARCP's credit ratings were also adversely impacted, making it more difficult for the Company to raise capital, among other things.  On October 30, 2014, Moody's placed ARCP's Baa3 senior unsecured rating under review for downgrade due to "ARCP's announcement that its Audit Committee found accounting discrepancies impacting the reported AFFO and that its 2013 Forms 10-K and 1Q14 and 2Q14 10-Qs should no longer be relied upon."  On December 16, 2014, Moody's issued a press release announcing the downgrade of ARCP's senior unsecured rating to Ba1 with a negative outlook "due to ARCP's announcement that its Chairman Nicholas Schorsch resigned on December 12 and its Kay and Beeson resigned on December 15." The same day, S&P lowered ARCP's credit rating due to a "high level of uncertainty surrounding ARCP after the company's CEO and President/COO resigned unexpectedly . . . ."[48]  Such downgrades have caused damages to ARCP by making the cost of borrowing significantly higher.

### B.     ARCPS' Value and Business Prospects are Severely and Detrimentally Impacted

209.     On October 1, 2014, ARCP filed a form 8-K which attached a press release disclosing that ARCP was going to sell its Cole Capital ("Cole") private capital management

---

[48] http://www.streetinsider.com/Credit+Ratings/S%26P+Downgrades+ARCP+(ARCP) +to+BB%3BRemains+on+CreditWatch+Negative/10102730.html

businesses to RCS Capital Corp. ("RCS") for $700 million (the "Cole Transaction").[49] Under the definitive agreement, ARCP would have been entitled to "an earn-out of up to an additional $130 million based upon Cole's 2015 EBITDA." In addition, RCS and ARCP entered into a "strategic arrangement by which ARC [would] act as sub-advisor to Cole's non-traded real estate investment trust, and acquire and property manage net lease real estate assets for the Managed Funds," among other things.

210.    ARCP's Press Release indicated that the Cole Transaction was anticipated to benefit ARCP in numerous ways, such as "Positive Long-Term Impact on Earnings and Capital Structure," "Corporate Real Estate Operation Streamlined," "Strategic Partnership with [RCS]," "Strategic Partnership with ARC Global II" and "Competitive Advantages Realized."

211.    Commenting on the Cole Transaction in the press release, Kay stated, "[t]his transaction significantly simplifies our business model, provides up a long-term economic stake in the growth and success of Cole Capital's investment programs and should enhance and accelerate the capitalization of these programs, thus improving the visibility of our fee stream while eliminating considerable overhead and volatility."

212.    On the heels of ARCP's announcement regarding the accounting improprieties, and little more than a month after the announcement of the Cole Transaction, on November 3, 2014, Edward M. Weil, Jr., ("Weil") the Chief Executive Officer of RCS, sent a letter to Kay and Richard A. Silfen of Arc Properties, informing them that RCS was terminating the purchase agreement ("Purchase Agreement") with ARC Properties.  In his letter, Weil cited certain breaches of the Purchase Agreement as grounds for the termination, including, among other things, the failure to devise and maintain a "system of internal accounting controls sufficient to

---

[49] The selling entity would actually be ARC Properties Operating Partnership L.P. ("ARC Properties") of which ARCP was the managing partner.

provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes."[50]

213.    ARCP issued a press release the same day responding to RCS's termination of the Purchase Agreement, calling the termination a violation of its agreement and asserting that there was no reason for RCS to terminate the Purchase Agreement.  ARCP also indicated that at that time, "the independent members of the ARCP Board of Directors and ARCP management are evaluating all alternatives under the agreement and with respect to the Cole Capital business generally."

214.    On November 11, 2014, ARCP and ARC Properties commenced an action against RCS in Delaware Chancery Court alleging that RCS breached the Purchase Agreement and seeking to enforce its rights.

215.    On December 4, 2014, ARCP issued a press release announcing that it had entered into a settlement agreement with RCS regarding the action brought in Delaware Chancery Court. The settlement called for ARCP to receive $60 million from RCS (consisting of $42.7 million in cash and a $15.3 unsecured note) and for the termination for the Purchase Agreement.  Thus, ARCP lost a substantial part of the benefit of selling Cole.

216.    Rather than receiving the $700 million payment for selling Cole as per the original Purchase Agreement, ARCP was stuck with a deteriorating asset. *Investment News* reported on January 12, 2015 that "Sales of nontraded real estate investment trusts at Cole [ ] fell off a cliff in December, with the leading sponsor and real estate manager selling a mere $4.5 million, compared with $274.4 million a year earlier."

---

[50] Letter from Edward M Weill, dated November 3, 2014 at paragraph (i).

217.   The January 12, 2015 *Investment News* article quoted Daniel Wildermuth, chief executive at Kalos Financial Inc. an independent broker dealer that focuses on alternative investment strategies, stated with regard to Cole: "Nobody can sell it, and the challenge is that the custodians have refused to allow the sale of more Cole Product."  Wildermuth stated, "If the situation doesn't change, Cole is facing more severe issues."

218.   On March 30, 2015, ARCP issued a press release announcing its financial results for the quarter and full year ended December 31, 2014.  The press release also revealed the financial impact to ARCP as a result of Cole's troubles.  According to the press release, ARCP recorded charges during 4Q14 of $223.1 million related to goodwill associated with Cole and $86.4 million related to the intangible asset value associated with the dealer manager and advisory contracts for Cole Capital.  The 2014 10-K explained the rationale for the impairment charges as follows:

> [T]here can be no assurance that any or all of the broker-dealers and clearing firms participating in the initial public offerings of Cole Capital's Managed REITs will reengage with Cole Capital on a timely basis or at all and that Cole Capital will find suitable replacements for its recently departed personnel. If these circumstances continue for a prolonged period of time, capital raising activity at Cole Capital would be negatively affected, reducing overall fee generation at Cole Capital and, therefore, the overall financial success of Cole Capital and the Company could be adversely affected and have an adverse effect on our financial condition, results of operations and cash flows. During the year ended December 31, 2014, we recorded significant impairment charges relating to the intangible asset value associated with the dealer manager and advisory contracts of the Managed REITs.

## DERIVATIVE AND DEMAND ALLEGATIONS

219.   Plaintiff brings this action derivatively in the right and for the benefit of ARCP pursuant to Federal Rule of Civil Procedure 23.1 to redress the willful neglect and bad faith breaches of fiduciary duty and other violations of law by the Former Officer Defendants in

connection with their intentional illegal conduct and their failure to properly prepare financial statements for the Company and Director Defendants' breach of their duties and the abdication of their duties and business judgment in failing to take appropriate action on behalf of the Company against the Former Officer Defendants and against Grant Thornton, as well as for failing to timely and properly institute whistleblower procedures pursuant to Section 301 of SOX.

220.    Plaintiff has been and continues to be a shareholder of ARCP at all times relevant to this Action and intends to hold their shares through the pendency of this Action.

221.    Plaintiff will adequately and fairly represent the interests of ARCP and its shareholders in enforcing and prosecuting its rights.

222.    On July 21, 2015, Plaintiff made a demand upon the Board of ARCP to take remedial action on behalf of ARCP.  Specifically Plaintiff demanded that the Board take action against certain of the Company's former officers, including but not limited to, Schorsch and Kay, and former employees Block and Beeson, and Grant Thornton for their roles leading to the massive restatement of the Company's financials in October 2014 and March 2015, and in their misconduct which led the Securities Action.

223.    The Board did not respond to Plaintiff's demand thus effectively refusing the demand.  Refusal of Kosky's demand was improper because an investigation of Kosky's demand was never taken.  Indeed, despite the ARCP board being told that Plaintiff would commence an action unless ARCP responded to the demand within 30 days, ARCP provided no response.  It did not even acknowledge the demand.  Failure to respond and conduct any investigation and provide any response to Plaintiff is equivalent to a formal rejection of the demand and establishes that the Board did not act reasonably or in good faith.  The complete abdication of the

Board's responsibilities cannot be the adequate exercise of business judgment. Further, any investigation which was undertaken by the Board pursuant to an earlier demand made by Joanne Witchko did not include consideration of claims against Grant Thorton, nor did it consider the June and November Rulings by this Court, and the fact that certain of the defendants, including Schorsch, Kay and Block, did not move to dismiss the Section 10(b) claims against them, and thus conceded that those claims were properly pled against them.

224.    From this, it can be more than reasonably inferred, that these Defendants are conceding that they acted with intentional conduct, at least at the pleading stage.

225.    Consequently, this is a properly pled and commenced demand ignored or refused, action, in which the Director Defendants have failed to exercise their fiduciary obligations much less acted with appropriate business judgment.

## COUNT I

## BREACH OF FIDUCIARY DUTY

(Against the Director Defendants)

226.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

227.    Each Director Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs, particularly with respect to maintaining compliance with applicable laws and regulations in core areas of the Company's business, as well as controls over disclosure.

228.    Plaintiff made a Demand to take action to seek reimbursement for the damages to ARCP caused by the misconduct of the Former Officer Defendants and Grant Thornton as further discussed above.

229.    Despite Plaintiff demonstrating good grounds to commence an independent investigation and take such action against the Former Officer Defendants as may be appropriate, the Director Defendants, in a way not protected by the business judgment rule, failed to make such investigation and failed to bring any action against the Former Officer Defendants and Grant Thornton., and failed to obtain proper tolling agreements given the running of the statute of limitations.

230.    The failure to take such appropriate action was a breach of the fiduciary duties they owed to the Company.

231.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, ARCP has sustained and continues to sustain significant damages.

## COUNT II

### BREACH OF FIDUCIARY DUTY

#### (Against the Former Officer Defendants)

232.    Plaintiff repeats and realleges paragraph 1 through 225 as if fully set forth herein.

233.    Each of the Former Officer Defendant owed to the Company and its shareholders the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs particularly with respect to their role in the preparation, issuance or approval of ARCP's financial statements and compliance with applicable laws and regulations in connection with the issuance of financial statements and filing financial statements with the Securities Exchange Commission.

234.    The Former Officer Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company and its shareholders and potentially illegal conduct. The Former Officer Defendants intentionally or

recklessly breached or disregarded their fiduciary duties and the federal securities laws and failed

to protect the rights and interests of ARCP by ensuring that any financial statements publicly

disclosed or filed with the SEC were materially accurate, and potentially engaged in illegal

conduct.

235.    To the extent that any of the Former Officer Defendants participated in preparing

financial statements, approving financial statements or signing SEC filings containing financial

statements, in breach of their fiduciary duties owed to ARCP and its shareholders, defendants

willfully, recklessly or negligently participated in conduct and caused the Company to expend

unnecessarily its corporate funds, and failed to act in good faith in their roles overseeing ARCP's

business, rendering them personally liable to the Company for breaching their fiduciary duties.

236.    There were numerous red flags that the Former Office Defendants ignored in

preparing, approving or signing the financial statements which were materially false and

misleading, as set for the above, including but not limited to (1) the fact that the Company was

rapidly expanding and thus that there was significant pressure on its accounting systems, which

could result in errors and manipulation; (2) the Company had pressure to meet earnings

expectations in that it was making repeated acquisitions and needed to raise money such that a

high or inflated AFFO, among other measures, could be used as a tool to meet those

expectations; (3) the same auditor, Grant Thornton, was simultaneously auditing 17 Schorsch-

related entities and earning millions of dollars in fees such that its independence was

questionable; and so it was unreasonable to rely on any assurances from it; (4) the Company was

dominated by Schorsch; (5) at least three of the Audit Committee members themselves were of

dubious independence; (6) financial reporting mistakes were reported by major shareholders; and

(7) there was potential manipulation and rapid changes in the Company's methods of accounting, i.e., its AFFO.

237.   Given these red flags, the Former Officer Defendants negligently, recklessly or willfully neglected their duties to assure that they did not prepare, approve or sign documents containing materially false and misleading financial statements unless they followed appropriate protocols and used reasonable care.  These financial statements violated GAAP in multiple ways, including improperly accounting for, among other things, merger-related expenses, long-lived assets, goodwill, related party transactions and bonus accruals.

238.   Given the degree to which ARCP's financials, particularly for the period of 2013 and 2014 had to be restated, it is more than reasonably inferable that the Former Officer Director Defendants negligently, recklessly or willfully neglected their fiduciary and other duties.

239.   As a direct and proximate result of defendants' breaches of their fiduciary obligations, ARCP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Former Officer Defendants are liable to the Company.

## COUNT III

## NEGLIGENCE

### (Against Grant Thornton)

240.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

241.   This Count is asserted against Grant Thornton in connection with its audit of the Company's financial statements and reviews of interim financial statements during the Relevant Period.

242.    Grant Thornton conducted its audit of the Company's annual financial statements and prepared its audit reports for the benefit of the Company, its management, directors and stockholders.   Grant Thornton addressed its audit report to the Company's Board and stockholders and conducted such audit and prepared such reports and letters with knowledge that the Company's management and directors were the intended recipients of such reports and letters and the Company's financial statements, that such audit was being conducted for their benefit, and that they would rely on such reports in connection with carrying out their responsibilities as managers and directors of the Company.

243.    Grant Thornton conducted its reviews of the Company's quarterly financial statements for the benefit of ARCP's management, directors and shareholders.   Grant Thornton conducted such reviews with knowledge derived from its audits of the Company's annual financial statements and with knowledge that the Company's management, directors and shareholders were the intended recipients of ARCP's quarterly financial statements, and that the Company's management and directors would rely on the quarterly financial statements in connection with carrying out their responsibilities as managers and directors.

244.    Grant Thornton owed to the Company, its management, and directors a duty to exercise that degree of due professional care, proficiency, and diligence required by professional standards.   This duty arose, in part, from its role as a certified public accountant and, in part, because Grant Thornton addressed its reports on the Company's financial statements to the Company's Board and because the Company's directors annually selected Grant Thornton as the auditor of the Company's financial statements.   Grant Thornton was able to foresee, and did foresee, that the Company's audited annual and quarterly reviewed financial statements would be relied upon by the Company's management, directors, and stockholders.

245. Grant Thornton owed to the Company, its management and directors a duty of due care in connection with its audit and reviews of the Company's annual and quarterly financial statements.

246. Grant Thornton read the Company's annual and quarterly reports to their shareholders, the Company's press releases announcing operating results, and all other public statements by the Company's management that incorporated or referenced all or portions of the Company's audited financial statements (See AU § 550 requiring the auditor to "read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements.").

247. Grant Thornton owed to the Company a duty of due care to assure the Company and their officers and directors that:

(a)     The Company stated its financial statements accurately, completely and fully in compliance with GAAP and applicable SEC rules and regulations; and

(b)     The Company's management and directors were informed of those matters of which, under the circumstances pertaining to the Company, they should have been informed, as described herein.

248. Grant Thornton breached each of the duties described in the preceding paragraphs.

249. Because of Grant Thornton's expertise in matters of accounting and auditing and other offered services, the Company relied on Grant Thornton to inform it of any financial or other matters that are the subject of the audit of a public company's financial statements or of the other offered services that would adversely affect the Company.

250. With respect to the functions and services performed or rendered as described in the preceding paragraphs, Grant Thornton failed to exercise that degree of diligence and due care

that the Company, its management and directors were entitled to expect of a professional services firm such as Grant Thornton.  Grant Thornton breached these duties by having knowledge of the material misstatements or omissions or having failed to exercise reasonable due diligence which would have uncovered the misstated nature of the financial statements.

251.   But for Grant Thornton's negligence, the Company would not have suffered the substantial losses it did suffer and will continue to suffer, and such losses were the direct and proximate cause and the foreseeable consequence of Grant Thornton's negligence.

252.   As a direct and proximate result of Grant Thornton's negligence, the Company has suffered economic losses and continues to suffer economic losses in an amount to be determined according to proofs at trial.

## COUNT IV

## BREACH OF CONTRACT

## (Against Grant Thornton)

253.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

254.   Grant Thornton was a party to written contracts with ARCP.  These contracts required Grant Thornton to provide services to ARCP in accordance with professional standards applicable to auditors.  The professional services required to be perform included a year- end audit for 2012 and 2013 and interim financial statement reviews during 2013 and 2014.

255.   ARCP has paid Grant Thornton the consideration called for by the contracts.

256.   Grant Thornton breached these contracts by, inter alia, failing to perform its audit and reviews in accordance with PCAOB Standards, as follows: (i) the auditors did not maintain an independence in mental attitude as required under such contracts; (ii) the audit and reviews

were not adequately planned as required under the contracts; (iii) the audit staff was not properly supervised as required under the contracts; (iv) the auditors did not exercise due care in the performance of the audits and reviews as required under the contracts; (v) the auditors failed to exercise professional skepticism as required under the contracts; (vi) the auditors failed to obtain an understanding of ARCP's internal controls as required under the contracts; (vii) the auditors should have investigated further the reporting changes made during the second quarter 2014, as required under the contracts; and (viii) the auditors should have investigated further the allegations made by McAlister as required under the contracts.

257.    As a direct and proximate result of Grant Thornton's breaches of contract, the Company has suffered economic losses in an amount to be determined according to proofs at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Determining that this is a proper derivative action and that Plaintiff is a fair and adequate representative of ARCP;

B.    In favor of the Company and against the Director Defendants, Former Officer Defendants  and Grant Thornton for all monetary damages the Company suffered as a result of the wrongful conduct alleged herein, in an amount to be determined at trial;

C.    In favor of the Plaintiff and her counsel and against the Director Defendants and Former Officer Defendants for the costs, expert fees, expenses and attorneys' fees incurred by Plaintiff and her counsel in  connection with  this action to the maximum extent permitted by law; and

D.    Awarding the Company such other and further relief as the Court finds just and

proper.

Dated:   New York, New York
         November 25, 2015

THEGRANTLAWFIRM, PLLC

By: /s/ Lynda J. Grant
521 Fifth Avenue, 17th Floor
New York, NY 10175
(212) 292-4441(*telephone*)
(212) 292-4442 (*facsimile*)
lgrant@grantfirm.com

STULL, STULL & BRODY

By: /s/  Mark Levine
Mark Levine
6 East 45th Street
New York, NY 10017
(212) 687-7230 (*telephone*)
(212) 490-2022 (*facsimile*)
mlevine@ssbny.com

***Counsel for Plaintiff***

## <u>VERIFICATION</u>

I, Fran Kosky on behalf of the Fran Kosky Roth IRA, hereby declare as follows:

I am a plaintiff in the within entitled action.  I have read the Shareholder Derivative Complaint ("Complaint") and know the contents thereof.  Based upon the discussion with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and accepted.

Dated:_____11/20/15_____

By:_____*Fran Kosky*_____
　　　　Fran Kosky